**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| In re: | Chapter 11 |
| WISCONSIN & MILWAUKEE HOTEL, LLC, | Case No. 24-21743 |
| Debtor. | Honorable G. Michael Halfenger |

# NOTICE OF APPEAL

Pursuant to Federal Rule of Bankruptcy Procedure 8002(a) and 28 U.S.C. § 158(a), notice is hereby given that Computershare Trust Company, N.A. (solely in its capacity as indenture trustee, taking direction from the bondholder, "Computershare") and Wisconsin & Milwaukee Hotel Funding LLC ("Funding," and together with Computershare, "Lenders"), appeal to the United States District Court for the Eastern District of Wisconsin, Milwaukee Division, from the Order Confirming the Debtor's Fourth Amended Chapter 11 Plan of Reorganization (the "Order") entered by this Court on October 9, 2026 [Dkt. 1105], as amended on October 22, 2026 [Dkt. 1113]. Lenders further appeal from all prior non-final judgments, orders, or decrees.

The following information is provided to conform substantially to Official Form 417A.

**Part 1: Identify the Appellants.**

1. Name of Appellants: Computershare Trust Company, N.A., and Wisconsin & Milwaukee Hotel Funding LLC
2. Position of Appellants in bankruptcy case that is subject of this appeal: Creditors

**Part 2: Identify the Subject of this Appeal.**

1. Describe the judgment—or the appealable order or decree—from which the appeal is taken: Lenders appeal from the October 9, 2026 Order Confirming the Debtor's Fourth

Amended Chapter 11 Plan of Reorganization, as amended by the Bankruptcy Court on October 22, 2026. Copies of (1) the October 9 Order, and (2) the October 22 Order amending that Order, are attached hereto.

2. State the date on which the judgment—or the appealable order or decree—was entered: October 9, 2026; amended October 22, 2026.

**Part 3: Identify the Other Parties to the Appeal.**

List the names of all parties to the judgment—or the appealable order or decree—from which the appeal is taken and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| *PARTY* | *ATTORNEY* |
|---|---|
| 1. Party: Creditor Computershare Trust Company, N.A., and Wisconsin & Milwaukee Hotel Funding LLC | Frank W. DiCastri, Sara C. McNamara, Monica A. Mark<br>Reinhart Boerner Van Deuren s.c.<br>1000 North Water Street, Suite 1700<br>Milwaukee, WI 53202<br>Telephone: 414-298-1000 |
| 2. Party: Debtor-In-Possession Wisconsin & Milwaukee Hotel, LLC | Michael P. Richman, Claire Ann Richman, Eliza M. Reyes<br>Richman & Richman LLC<br>122 West Washington Avenue, Suite 850<br>Madison, WI 53703<br>Telephone: 608-200-3408 |
| 3. Party: U.S. Trustee Office of the U.S. Trustee | Dillon J. Ambrose, Laura D. Steele<br>United States Trustee<br>517 East Wisconsin Avenue, Suite 430<br>Milwaukee, WI 53202<br>Telephone: 414-297-4499 |

**Part 4: Optional Election to have Appeal Heard by District Court (Applicable Only in Certain Districts).**

A Bankruptcy Appellate Panel is not available in this judicial district.

COMPUTERSHARE TRUST COMPANY, N.A.
WISCONSIN & MILWAUKEE HOTEL FUNDING LLC

*/s/ Monica A. Mark* DATE: October 23, 2026

Frank W. DiCastri
Sara C. McNamara
Monica A. Mark
REINHART BOERNER VAN DEUREN s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202-3186
414-298-1000
fdicastri@reinhartlaw.com
smcnamara@reinhartlaw.com
mmark@reinhartlaw.com

So Ordered.

Dated: October 9, 2026

G. Michael Halfenger
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Wisconsin & Milwaukee Hotel LLC,

Debtor.

Case No. 24-21743-gmh
Chapter 11

Address: 731 North Jackson Street, Suite 420
Milwaukee, WI 53202

Employer's Tax Identification No.: 45-2686995

## ORDER CONFIRMING THE DEBTOR'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Debtor Wisconsin & Milwaukee Hotel LLC filed its fourth amended chapter 11 plan of reorganization on January 12, 2026. ECF No. 853. The court held an evidentiary hearing on confirmation of the debtor's chapter 11 plan on May 26, 2026, through May 28, 2026. After the conclusion of post-hearing briefing on July 22, 2026, the court took the matter under advisement. On October 9, 2026, the court issued an opinion concluding that the debtor demonstrated that the plan complies with all applicable requirements of 11 U.S.C. §1129. For the reasons stated in the October 9 opinion, IT IS

HEREBY ORDERED as follows:

1. The requirements set forth in 11 U.S.C. §1129(a) & (b) have been satisfied, and the fourth amended chapter 11 plan of reorganization of Wisconsin & Milwaukee Hotel filed on January 12, 2026, ECF No. 853, is confirmed.
2. A copy of the confirmed plan is attached.

# # # # #

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

In re:

Wisconsin & Milwaukee Hotel LLC,

Case No. 24-21743-gmh
Chapter 11

Debtor.

# FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WISCONSIN & MILWAUKEE HOTEL LLC DATED JANUARY 12, 2026

This Fourth Amended Chapter 11 Plan of reorganization (the "**Plan**") is proposed by Wisconsin & Milwaukee Hotel LLC (the "**Debtor,**" the "**Hotel**," or "**WMH**") pursuant to section 1121 of chapter 11 of the Bankruptcy Code. The Plan provides for the reorganization of the Debtor, and an auction and sale of the equity ("**Equity Sale**") of the reorganized Debtor in order to raise $8,000,000 for necessary renovations and to provide a cushion against any potential shortfalls in operations revenues to assure that the Debtor will meet the financial obligations of this Plan. Reference is made to the Second Amended Disclosure Statement of January 12, 2026 accompanying this Plan for a discussion of the Debtor's history, business, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters.

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

A. For purposes of this Plan, the following terms shall have the respective meanings set forth below:

1.1. "**Administrative Expense Claim**" means a Claim for costs and expenses of administration of this Case and allowed under sections Section 503(b), 507(a)(2), and 507(b) of the Code that is entitled to priority in payment pursuant to Section 507(a)(1) of the Code, and includes, without limitation, (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the estate and operating the Debtor's business, and (b) allowed professional fee claims. For purposes of this Plan, Administrative Expense Claim also means all cure amounts required to be paid pursuant to Section 365(b) of the Code.

1.2. "**Allowed Claim**" means a Claim or Interest that is evidenced by a Proof of Claim or Interest which is filed timely pursuant to Section 501 of the Bankruptcy Code and/or which is allowed pursuant to Section 502 of the Bankruptcy Code, a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim or Interest, as applicable, has been timely filed, or a Claim or Interest that is Allowed by Final Order of the Bankruptcy Court.

1.3. "**Amended Operating Agreement**" means that certain amended and restated operating agreement of the Debtor to be executed on the Effective Date by and among the holders of New Common Units, which shall set forth the rights and obligations of the holders of New Common Units with respect to corporate governance matters and which shall be included in the Plan Supplement.

1.4. "**Auction and Bidding Procedures**" has the meanings set forth in section 5.10 of this Plan.

1.5. "**Avoidance Actions**" shall mean any claims or causes of action of the Debtor's estate commenced, or that may be commenced, before or after the Effective Date pursuant to Chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550, 551, or 553.

1.6. "**Ballot**" means the form(s) distributed to holders of impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

1.7. "**Bankruptcy Code**" or "**Code**" means Title 11 of the United States Code as it exists, or as may be hereafter amended.

1.8. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure which have been promulgated and made effective as of August 1, 1983, together with any amendments and modifications thereto.

1.9. "**Bar Date**" means June 21, 2024.

1.10. "**Business Day**" means any day other than a Saturday, Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

1.11. "**Case**" or "**Chapter 11 Case**" means *In re Wisconsin & Milwaukee Hotel LLC,* Chapter 11 Case No. 24-21743-gmh, captioned above.

1.12. "**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

1.13. "**Claimant**" means the holder of a claim.

1.14. "**Class**" means a category of holders of claims or interests which are substantially similar to other claims or interests in such class and which category has been segregated for treatment as part of this Plan pursuant to Section 1222(b) of the Bankruptcy Code.

1.15. "**Code**" means the United States Bankruptcy Code, 11 U.S.C. title 11.

1.16. "**Common Units**" means the New Equity voting common membership interests of the Reorganized Debtor to be issued to JSM or such other person who is deemed the Winning Bidder and successfully closes on the acquisition following the Equity Auction, and shall have such distribution rights, and other rights, preferences, and privileges as set forth in the Amended Operating Agreement.

1.17. "Conditions to the Effective Date" means the conditions described in Section 7.3 of this Plan.

1.18. "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Court.

1.19. "**Confirmation Order**" means the order of the Court confirming this Plan.

1.20. "**Counterparty**" means a person or entity that is party to an Executory Contract to which the Debtor is also a party.

1.21. "**Court**" means (a) the United States Bankruptcy Court for the Eastern District of Wisconsin (the "**Bankruptcy Court**"), in which the Debtor's chapter 11 case is pending pursuant to a referral of jurisdiction by the United States District Court for the Eastern District of Wisconsin, (b) any court having competent jurisdiction to enter Final Orders or judgments, conduct *de novo* review of issues and withdraw any portion of the above-captioned proceeding from the Bankruptcy Court, and (c) any court having competent jurisdiction to hear appeals or *certiorari* proceedings from any of the foregoing.

1.22. "**Creditor**" means any person or its assignee that holds a Claim against the Debtor for unsecured debts, liabilities, demands, or Claims of any character whatsoever, including any under-secured creditors.

1.23. "**Debt**" means liability on a Claim.

1.24. "**Debtor**" means Wisconsin & Milwaukee Hotel LLC, the Debtor in this Chapter 11 case.

1.25. "**Discharge**" means an order of the Court pursuant to 11 U.S.C. § 1141(d).

1.26. "**Disclosure Statement**" means the "Second Amended Disclosure Statement relating to this Plan, including, all schedules, supplements, and exhibits thereto, as approved by the Bankruptcy Court pursuant to Section 1125.

1.27. "**Disclosure Statement Order**" means a Final Order finding that the Disclosure Statement contains adequate information pursuant to Section 1125.

1.28. "**Effective Date**" means the date on which the Plan shall take effect, which shall be a Business Day after the Confirmation Date, selected by the Debtor, on which: (a) no stay of the Confirmation Order is in effect; and (b) all Conditions to the Effective Date specified in Article 7 below have been satisfied or waived.

1.29. "**Equity Auction**" means the auction sale of New Equity to be conducted pursuant to the Auction and Bidding Procedures and 363 Motion for at least $8,000,000.

1.30. **"Equity Auction Excess Proceeds"** means proceeds (net of any marketing expenses) of the Equity Auction that exceed $8 million.

1.31. "**Estate**" means the estate of the Debtor created pursuant to section 541 of the Code.

1.32. "**Executory Contracts**" has the meaning given in Section 365, and includes unexpired leases. "**Existing Equity Holders**" means Holders of Equity Interests in the Debtor as of the Petition Date.

1.33. "**Existing Equity Interests**" means all issued and outstanding Equity Interests in the Debtor as of the Petition Date.

1.34. "**Final Order**" means an order or judgment of the Court that has not been reversed, stayed, modified, or amended, and that is no longer subject to appeal, *de novo* review or *certiorari* proceeding, and as to which no appeal, *de novo* review or *certiorari* proceeding is pending.

1.35. "**Impaired**" means, with respect to a Claim or Class of Claims, "impaired" within the meaning of section 1124.

1.36. "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating

to, or whose value is related to, any such interest or other ownership interest in the Debtor.

1.37. "**JSM**" means Jackson Street Management, LLC, the owner of 99.99% of the Debtor's existing Equity, and the Debtor's managing member.

1.38. "**JSM Bid**" means the legally binding commitment by JSM or its designee, pursuant to the New Equity Subscription Agreement, to acquire the New Equity for $8 million on the Effective Date.

1.39. "**Lenders**" means Computershare Trust Company, N.A., as trustee ("**Computershare**") and Wisconsin & Milwaukee Hotel Funding, LLC ("**WMH Funding**").

1.40. "**Lien**" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.41. "**New Equity**" means the Common Units.

1.42. "**New Equity Subscription Agreement**" means that certain agreement to purchase New Equity, as described in section 5.10 of this Plan, the form of which shall be included in the Plan Supplement.

1.43. "**New Organizational Documents**" means the organizational and governance documents for the Reorganized Debtor, including, without limitation, articles of organization, the Amended Operating Agreement, or other similar documents, which shall be consistent with the terms of this Plan, and shall be included in the Plan Supplement.

1.44. "**Petition Date**" means April 9, 2024, the date on which the voluntary petition was filed by the Debtor commencing this Case, resulting in the entry of an order for relief.

1.45. "**Plan**" or "**Plan of Reorganization**" means this Plan, all addenda, exhibits, schedules, releases or other attachments hereto, and shall include any subsequent amendments or modifications of this Plan filed either before or after the Confirmation Date.

1.46. "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which will be Filed by the Debtor contemporaneously herewith, and such additional documents as may be filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement, including the following: (a) the New Organizational Documents; (b) the New Equity Subscription Agreement; (c) the RFIC Loan

Commitment; and (d) any other necessary documentation related to the Plan and the Equity Auction. The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the terms of this Plan. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in the Plan.

1.47. "**Priority Claim**" means a Claim, other than an Administrative Expense Claim, entitled to priority under section 507 of the Code.

1.48. "**Pro Rata**" means the same proportion that an Allowed Claim in a particular class bears to the aggregate amount of all Allowed Claims in such class.

1.49. “**Reorganized Debtor**” means the Debtor, as reorganized, pursuant to and under the Plan, on and after the Effective Date.

1.50. “**RFIC**” means Reiman Family Investment Company, LLC, an investor in JSM and the lender to JSM under the RFIC Loan Commitment.

1.51. "**RFIC Loan Commitment**” means that certain agreement to be executed by and between RFIC and JSM, and related promissory note, pursuant to which RFIC will loan to JSM at least $8 million in order that JSM may be the Stalking Horse Bidder at an Equity Auction of the New Equity, and consummate the JSM Bid. The RFIC Loan Commitment shall be filed as part of the Plan Supplement.

1.52. “**Section**” refers to a section of the Code.

1.53. "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Debtor has an interest.

1.54. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

1.55. "**Security**" means a security as defined in section 2(a)(1) of the Securities Act.

1.56. “**Stalking Horse Bidder**” means JSM pursuant to the JSM Bid.

1.57. “**363 Motion**” means the motion that the Debtor will file on or before January 12, 2026, seeking approval of the Equity Auction Sale and Bidding Procedures, and as further described in section 5.10 of this Plan.

1.58. “**Unimpaired**” means, with respect to a Claim or Class of Claims, not “impaired” within the meaning of section 1124.

1.59. "**Unsecured Claim**" means a Claim that is not secured by a Lien on property in which the Debtor or an entity in which Debtor is a member has an interest.

1.60. "**Winning Bid" and "Winning Bidder**" means the bid and person, respectively that is determined by the Debtor, at the conclusion of the Equity Auction, to have presented the highest and best bid.

B. **Additional Rules of Interpretation**.

1. **Undefined Terms**. Terms not defined in this Plan that are defined in the Code shall have the meanings stated in the Code. For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; and (i) "$" or "dollars" means United States dollars.

2. **Nonseverability of Plan Provisions.** If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified

without the Debtor's or Reorganized Debtor's consent, as applicable; and (c) nonseverable and mutually dependent.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND INTERESTS

The Debtor's Plan provides for payment of all Allowed Claims that are also Secured Claims, to the extent they are allowed, and Priority Claims, and a distribution to all Allowed Claims that are Unsecured Claims. Where applicable, the amortization on these obligations has generally been designed to provide adequate cash flow for prospective business operations, and to service debt and other obligations under this Plan. The classes of claims designated and treated under the Plan for Allowed Claims are as follows:

2.1 **CLASS 1 (and Options 1A, 1B and 1C)** - Secured Claim of Computershare Trust Company, N.A., as trustee ("**Computershare**").

2.2 **CLASS 2** – Secured Claim of Wisconsin, Milwaukee & Hotel Funding LLC ("**WMH Funding**").

**2.3** **CLASS 3** - Secured Claim of J.M. Brennan, Inc. ("**JMB**")

2.4 **CLASS 4** – Priority Unsecured Claim of US Foods, Inc. ("**US Foods**").

2.5 **CLASS 5** – Unsecured Claims of White Lodging Services Corporation ("**White Lodging**").

2.6 **CLASS 6** – Unsecured Claim of Computershare.

2.7 **CLASS 7** – Unsecured Claim of WMH Funding.

2.8 **CLASS 8** – Unsecured Vendor Claims.

2.9 **CLASS 9** -- Unsecured Claims of JSM and Wave Renovations

2.10 **CLASS 10** – Equity Interests of the Debtor.

## ARTICLE 3
## TREATMENT OF CLAIMS AND INTERESTS

3.1 **Administrative Expense Claims.** Administrative Expense Claims include all costs and expenses of the administration of the Debtor's case allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) thereof. The Plan provides for payment in full of all allowed

administrative expenses on the effective date of the Plan, unless other treatment is specifically set forth in the Plan. Administrative Expense Claims include fees of professionals employed by the Debtor, including attorneys, appraisers, and accountants, and quarterly UST fees (discussed under Statutory Fees below). The Debtor estimates that at the Effective Date of Plan Confirmation, there will be approximately $1,606,000 in unpaid administrative expense claims comprising professional fees, the contract assumption cure amounts set forth in Article 4 below, and an amount to be reserved for the payment of the White Lodging Administrative Expense Claim, which is pending determination of the Debtor's Motion for Reconsideration of May 15, 2025 Order Granting in Part White Lodging Services Corporation's Motion for Allowance of Administrative Expense Claim [Doc 563]. If this motion is not resolved or otherwise settled prior to the Effective Date, then on the Effective Date the Debtor shall continue to reserve the disputed amount in a segregated account pending such final resolution or settlement.

3.2 **Statutory Fees**. On or before the Effective Date, cash shall be disbursed on account of fees payable under 28 U.S.C. § 1930 in an amount equal to the amount of any such fees. Notwithstanding any other provisions in this Plan to the contrary, the Debtor shall remain obligated to pay fees pursuant to 28 U.S.C. § 1930 until such time as the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

3.3 **CLASS 1 – Secured Claim of Computershare.**

Computershare filed Claim 11 in the total amount of $48,606,171.63. The Debtor has herein allowed $44,546,698,48, consisting of $45,553,800.86 (per agreementless adequate protection payments of $1,007,102.38 from the Petition Date through January 2, 2026) as the aggregate amount of such Claim (the "**Aggregate Claim**").[1] On July 25, 2025, the Court determined that the value of the Hotel collateral securing Claim 11 was $26,000,000 [Doc 697]. Thus, in accordance with Code Section 506(a), $26,000,000 is treated as a Class 1 secured claim, and $18,546,698.48 (the difference between the Aggregate Claim and the Class 1 secured claim) is treated as a Class 6 unsecured claim. The secured claim of Computershare is impaired, and entitled to vote to accept or reject the Plan, in accordance with one of the following three options, which it shall elect in writing on the ballot provided for Class 1, and returned to the Debtor prior to this Court's entry of an order approving the Disclosure Statement. In the event that Computershare does not make a timely election,

[1] As of the date of this Plan, there was pending a motion by the Debtor [Doc 829] to terminate further adequate protection payments. In the event such payments are continued beyond January 2, 2026, the Aggregate Claim will be reduced further by such amounts, with a corresponding reduction to the Class 6 Claim and payment amounts.

its secured claim shall be treated in accordance with Option 1A and its unsecured claim shall be treated in accordance with Class 6.

- **Option 1A:** Provided that Computershare does not elect to proceed under Options 1B or 1C as discussed herein, Computershare's secured claim shall be $26,000,000, which amount represents the total current value of the Hotel and other assets pledged by the Debtor to secure the WHEDA Loans. Computershare's secured claim shall be paid in full, with interest, over a term of 18 years from the Effective Date, at a rate of 320 basis points over the yield on the Effective Date as reported by the United States Department of the Treasury for five-year Treasury securities, and adjusted on the 5th, 10th and 15th anniversaries of the Effective Date (the "**Adjustment Dates**") to reflect 320 basis points over the yield on each Adjustment Date as reported by the United States Department of the Treasury for five-year Treasury securities as of each such Adjustment Date. . Payments of $1,500,000 per annum, shall be paid in equal monthly instalments of $125,000, with the first payment due on the first day of the first full month that begins after 30 days fromthe Effective Date, with each subsequent monthly payment due on the first day of each subsequent month, and followed by a final balloon payment of $34,322,050.00 on the first day of the 217th month, estimated to be November 2044.

  If Computershare elects to proceed under Option 1A (or by failing to elect any option, is treated under Option 1A and Class 6), Computershare shall retain liens securing its secured claim hereunder until such time as its secured claim has been paid in full pursuant to the terms of the Plan, at which time Computershare shall execute documents reasonably necessary to release all liens or security interests in any and all property securing Computershare's claim.

- **Option 1B:** Provided that Computershare does not proceed under Option 1A as discussed herein, and Computershare makes a timely election pursuant to the provisions of Section 1111(b), Computershare shall have a secured claim in an amount which is calculated to be $61,322,050, and have a present value of $26,000,000, based upon its payment in full over a term of 18 years from the Effective Date, at a rate of 320 basis points over the yield reported by the United States Department of the Treasury for five-year Treasury securities on the Effective Date, and adjusted on the 5th, 10th and 15th anniversaries of the Effective Date (the "**Adjustment Dates**") to reflect 320 basis points over the yield reported by the United States Department of the Treasury for five-year Treasury securities as of each such Adjustment Date. (For illustration purposes only, as of the date of this Plan, the Claim amount herein is estimated to be $61,322,050.00 on the basis of an interest and discount rate of 6.9%, derived from 320 basis points


Case 2:26-cv-01974-LA Filed 10/23/26 Page 15 of 80 Document 1
Case 24-21743-gmh Doc 1105 Entered 10/09/26 18:42:08 Page 12 of 38

over the recently-reported 3.7% yield on five-year Treasury securities.) Fixed payments of $1,500,000 per annum, shall be made in equal monthly payments of $125,000, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, with each subsequent monthly payment due on the first day of each subsequent month, and followed by a final balloon payment of $34,322,050 ("**Balloon Payment**") which shall be paid on the first day of the 217th month, estimated to be November 2044. On each Adjustment Date that the interest rate to be applied hereunder changes, the Balloon Payment shall be increased or decreased as may be appropriate to assure that the Effective Date present value remains $26,000,000.

If Computershare elects to proceed under Option 1B, Computershare shall retain liens securing its claim until such time as its secured claim has been paid in full pursuant to the terms of the Plan, at which time Computershare shall execute documents reasonably necessary to release all liens or security interests in any and all property securing Computershare's claim.

- **Option 1C**: Computershare may elect to have JSM (or its designee) (for purposes of this Option 1C, the "**Bond Purchaser**") purchase the Bonds held by WMH Funding, and assigned to Computershare, or the WHEDA Loans (at the Bond Purchaser's election) on the Effective Date, for $26,000,000 in exchange for full and complete reciprocal releases, provided that such election must be expressed in a writing delivered to Debtor's counsel on or before the close of business on Friday, January 30, 2026 (except that this deadline may be extended at the Debtor's sole discretion). If this Option 1C is elected, for purposes of this Plan the Bond Purchaser shall be deemed to hold either the Class 1A and Class 6 claim in lieu of Computershare, or the Class 1B claim in lieu of Computershare, as the Bond Purchaser may in writing elect on or before the conclusion of Plan confirmation hearings.

3.4 **CLASS 2 – Secured Claim of WMH Funding.**

The secured claim of WMH Funding is impaired under the Plan, and treated as $0.00, because the value of the collateral securing the guaranty of a $2,104,633.00 loan made to non-debtor JSM, is less than the amounts needed to satisfy the Aggregate Claim of Computershare, which is senior in priority on the same collateral.

3.5 **CLASS 3 – Secured Claim of J.M. Brennan, Inc.**

The secured claim of J.M. Brennan, Inc. is impaired under the Plan, and treated as $0.00, because the value of the collateral securing its $81,502.10 for unreimbursed Hotel repairs, is less than the value of the collateral securing the Aggregate Claim of Computershare, and the WMH Funding Claim, which are senior in priority on the same collateral.

3.6 **CLASS 4 – Priority Unsecured Claim of US Foods.**

The claimant in Class 4 is unimpaired with respect to its priority unsecured claim of $15,556.94, which shall be paid in full on the Effective Date.

3.7 **Equity Auction Excess Proceeds for Unsecured Creditors**.

With respect to Holders of Allowed Unsecured Claims in Classes 5, 6, 7, 8, and 9 below, except to the extent that any such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Claim, each Holder of an Allowed Unsecured Claim in Classes 5, 6, 7 and 8 shall receive, in addition to the treatment set forth below, its pro rata share of any Equity Auction Excess Proceeds up to such amount as will constitute payment of its Allowed Unsecured Claim in full, taking account of all payments scheduled below that have been made through the date of distribution of the Equity Auction Excess Proceeds. Total distributions of such Excess Sale Proceeds, less any distributions previously made, shall be treated as a prepayment of and in lieu of any scheduled distributions yet to be made, and will otherwise be capped at 100% of the Allowed amount of such Claims. In the event that all Allowed Unsecured Claims in Classes 5, 6, 7 and 8 are paid in full on the basis of the foregoing, and Excess Sale Proceeds remain, the Unsecured Creditors in such Classes will then be paid interest at the same rate applicable to the Class 1A and Class 1B Claims (approximately 6.9% as of today by illustration only) from the Effective Date to the date of such full payment. If Excess Sale Proceeds remain after the prior distributions above, they shall then be distributed on the same basis, including interest if paid in full, up to 100% of the Allowed amount of the Claims of the Holders of Allowed Unsecured Claims in Class 9. For the avoidance of doubt, no distributions of Equity Auction Excess Proceeds shall be made to Holders of Allowed Unsecured Claims in Class 9, unless any such excess proceeds remain after distributions have first been made to Classes 5, 6, 7, and 8 in amounts sufficient to pay the Allowed Claims in such Classes in full, plus interest.

The treatment provided to Unsecured Claims under this Plan has been structured to comply with the Bankruptcy Code, including the requirements of section 1129(a)(7) (the "best interests" test) and, to the extent applicable,

section 1129(b) (the "fair and equitable" test). The Disclosure Statement contains a liquidation analysis demonstrating that the value being provided to Holders of Unsecured Claims under the Plan exceeds what such Holders would receive in a hypothetical chapter 7 liquidation.

3.8 **CLASS 5 – Unsecured Claims of White Lodging.**

The White Lodging claims are impaired. White Lodging has asserted Claims 15 and 16 of approximately $22,500,000. It shall be allowed a claim of $1,040,000 (or such other amount as may be determined by the Court in connection with ongoing litigation of the Debtor's objections to Claims 15 and 16), to be paid a 10% dividend of $104,000 over 18 years in equal monthly payments, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, or within a reasonable time after a settlement or final judicial determination of the amount of its claims in the event litigation of its claim amounts is ongoing. The Debtor will show through a line item on its projections that it will have sufficient resources to pay White Lodging 10% or $2,250,000 over 18 years, which would equate to $125,000 per year, or $10,417 per month, were the Court to conclude through the foregoing adjudication to the full amounts asserted in Claims 15 and 16.

3.9 **CLASS 6 – Unsecured Claim of Computershare.**

Class 6 is Computershare's deficiency claim (its Aggregate Claim less the portion treated as secured under Class 1), in the amount of $18,546,698.48, and is impaired (*see* note 1), unless Class 1 elected to have its claim treated pursuant to Options 1B or 1C (as discussed above), in which case the Class 6 Claim will either be extinguished (if Option 1B is elected) or it may become the Claim of the Bond Purchaser if Option 1C is elected. This unsecured claim shall be paid a 10% dividend in the amount of $1,854,669.85 over 18 years in equal monthly payments of $8,586.43, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, and each monthly payment due on the 1st day of the same month thereafter, until paid in full.

3.10 **CLASS 7 – Unsecured Claim of WMH Funding.**

Class 7 is the unsecured claim of WMH Funding in the amount of $2,113,408.30. WMH shall be paid a 10% dividend in the amount of $211,340.83 over 18 years in equal monthly payments of $978.43, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, and each monthly payment due on the 1st day of the same month thereafter, until paid in full. Any lien rights WMH Funding may have shall be extinguished upon the Effective Date.

3.11 **CLASS 8 – Vendor Unsecured Claims.**

Class 8 consists of Vendor Unsecured Claims, representing primarily trade debt of the Debtor, which totals approximately $567,000. The claimants in Class 8 are impaired. Class 8 claimants shall be paid a 50% dividend in the approximate aggregate amount of $283,000 pro-rata, in quarterly payments of $28,350 over a 2 ½ year period, with the first quarterly payment due on the first day of the calendar quarter that begins after the Effective Date, and each quarterly payment due on the 1st day of each calendar quarter thereafter, until paid in full.

3.12 **CLASS 9 – Unsecured Claims of JSM and Wave Renovations.**

Class 9 consists of Unsecured Claims of JSM and Wave Renovations, representing short term loans to the Debtor, which totals approximately $863,167. The claimants in Class 9 are impaired. Class 9 claimants shall be paid a 50% dividend in the approximate aggregate amount of $431,583 pro rata, in quarterly payments of $43,158 over a 2 ½ year period, *with the first quarterly payment due on the first day of the calendar quarter that begins after the completion of all the distributions provided for in Class 8*, and each quarterly payment due on the 1st day of each calendar quarter thereafter, until paid in full.

3.13 **Equity Auction Excess Proceeds for Equity Interest Holders**.

With respect to Holders of Allowed Equity Interests in Class 10 below, each Holder of an Allowed Equity Interest shall receive its pro rata share of any Equity Auction Excess Proceeds if, and only to the extent that, any such proceeds remain after such proceeds have first been applied to the payment in full, plus interest, of Claims in Classes 5, 6, 7, 8, and 9.

3.14 **CLASS 10 - Equity Interest Holders of the Debtor.**

All Equity Interests in the Debtor will be extinguished on the Effective Date. However, holders of Equity Interests of the Debtor shall receive pro rata any Equity Auction Excess Proceeds that may remain after the treatment of Classes set forth in section 3.13 above, and will retain such rights in the event that there are any Equity Auction Excess Proceeds available to be distributed to them after their Equity Interests are extinguished on the Effective Date. Because no distributions of Equity Auction Excess Proceeds will be made to Class 10 Equity Interest Holders unless all unsecured creditors are paid in full, plus interest, the Debtor submits that the distribution provided herein does not implicate or violate the Absolute Priority Rule under Code section 1129(b)(2)(B)(ii).

3.15 **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

3.16 **Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

## ARTICLE 4
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Any and all executory contracts or unexpired leases to which the Debtor was a party as of the Petition Date shall be deemed rejected as of the Effective Date, ***except*** with respect to any contracts assumed with Court authority during the pendency of this chapter 11 case, as well as the following parties' contracts:

4.1 **Access One, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract with Access One, Inc., for SIP (telephone) services at the Hotel. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $213.27.*

4.2 **Airgas USA, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of a service contract with Airgas USA, LLC, for the provision of gas for beverage services at the Hotel. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,268.81.*

4.3 **Amadeus Hospitality Americas, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract with Amadeus Hospitality Americas, Inc. for HOTSOS preventative maintenance. No amount is required to cure any outstanding defaults under the service contract.

4.4 **American Airlines, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its month to month contract with American


Case 2:26-cv-01974-LA Filed 10/23/26 Page 20 of 80 Document 1
Case 24-21743-gmh Doc 1105 Entered 10/09/26 18:42:08 Page 17 of 38

Airlines, Inc. for the reservation of flight personnel rooms. No amount is required to cure any outstanding defaults under the service contract.

4.5 **ASCAP.** The Confirmation Order shall authorize and approve the Debtor's assumption of its music licensing contract with ASCAP. No amount is required to cure any outstanding defaults under the licensing contract.

4.6 **Averus Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its month-to-month service contract with Averus Inc. for kitchen hood cleaning. No amount is required to cure any outstanding defaults under the service contract.

4.7 **Canon Solutions America, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its contract for copier services with Canon Solutions America, Inc. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $385.71.*

4.8 **CINTAS Corporation.** The Confirmation Order shall authorize and approve the Debtor's assumption of its supply contract with CINTAS Corporation for the provision of kitchen uniforms. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,903.61.*

4.9 **Cvent PassKey**. The Confirmation Order shall authorize and approve the Debtor's assumption of its contract for room key software. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $10,524.*

4.10 **Granite Telecommunications.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for EPIK (telephone) services at the Hotel. No amount is required to cure any outstanding defaults under the service contract.

4.11 **JS Asset Management LLC.** (A) Provided that JSM is the Winning Bidder in the Debtor's Equity Auction Sale, the Confirmation Order shall authorize and approve the Debtor's assumption of the consulting and asset management agreement with JS Asset Management, LLC (an affiliate of the Debtor's manager and principal equityholder JSM). *As of August 31, 2026, approximately $337,934 will be required to be paid as administrative expenses for post-petition services regardless of the outcome of the Equity Auction Sale, and is accounted for as an Effective Date payment in Section 3.1, above.* JS Asset Management has agreed that upon assumption of its contract on the Effective Date, the Reorganized Debtor shall pay the cure amount for unpaid prepetition fees ($867,270.63) on a quarterly basis of $43,364 per quarter, over a five-year period, commencing with the beginning of the first quarter *after all payments required to be made to Class 8 creditors have been completed.*. (B) In

the event that JSM is not the Winning Bidder in the Debtor's Equity Auction Sale, JS Asset Management's administrative expense claim for post-petition services shall still be paid on the Effective Date, but its consulting and asset management agreement shall be rejected, its prepetition claim amount of $867,270.63 shall be treated as a Class 9 Unsecured Claim, and it shall be treated in the same manner as other Class 9 Claims (including the right to Equity Auction Excess Proceeds, if any).

4.12 **Knowland Group, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for reader board services utilized at the Hotel with Knowland Group, LLC. No amount is required to cure any outstanding defaults under the service contract.

4.13 **Marriott International Inc.** Whether or not JSM is the Winning Bidder in the Debtor's Equity Auction Sale, the Confirmation Order shall authorize and approve the Debtor's assumption of that certain Franchise Agreement Between Marriott International, Inc and Wisconsin & Milwaukee Hotel LLC, dated as of June 17, 2011 (the "**Marriott Franchise Agreement**") solely pursuant to the terms of that certain *Stipulation and Agreed Order Between the Debtor and Marriott International, Inc. Authorizing Assumption of Executory Contract Pursuant to the Provisions of 11 U.S.C. 365(a)* [Doc 849], filed on January 12, 2026 (the "**Marriott Assumption Stipulation**"), including, without limitation, in the event JSM is not the Winning Bidder in the Debtor's Equity Auction Sale, requiring a third-party purchaser to strictly adhere to Marriott's procedures for a re-licensing franchise agreement. To the extent the terms of the Amended Plan or the Confirmation Order conflict or are inconsistent with the terms of the Marriott Assumption Stipulation, the terms of the Marriott Assumption Stipulation shall control and govern to the extent of such conflict or inconsistency.

*At this time, the Debtor believes that the cure amount to be paid in connection with assumption of the Marriott Franchise Agreement is not less than $225,000, which amount does not include the full amount of (i) any outstanding post-petition franchise fees, and (ii) attorneys' fees incurred by Marriott in connection with the Debtor's chapter 11 filing and the formulation, negotiation and finalization of a written amendment to the Marriott Franchise Agreement or a re-licensing franchise agreement, as applicable. Accordingly, this cure amount is subject to increase and adjustment.*

4.14 **OpenTable, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for F&B reservations and marketing with OpenTable, Inc. No amount is required to cure any outstanding defaults under the service contract.

4.15 **Prescriptive Music, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for music programming in the Hotel's public areas. No amount is required to cure any outstanding defaults under the service contract.

4.16 **Relay Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for distress devices for Hotel associates. No amount is required to cure any outstanding defaults under the service contract.

4.17 **Restaurant Technologies, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract with Restaurant Technologies, Inc. for fryer oil filtration services. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,399.69.*

4.18 **SESAC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the music licensing contract for the Hotel. No amount is required to cure any outstanding defaults under the licensing contract.

4.19 **Tambourine.** The Confirmation Order shall authorize and approve the Debtor's assumption of the marketing service contract with Tambourine. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,699.07.*

4.20 **Towne Park, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for valet parking services with Towne Park, LLC. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $58,615.00.*

4.21 **Trane U.S.** The Confirmation Order shall authorize and approve the Debtor's assumption of its maintenance contract with Trane U.S. for the maintenance of the Hotel's HVAC/air conditioning system. No amount is required to cure any outstanding defaults under the marketing services contract.

4.22 **Trip Advisor LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the its marketing services contract with Trip Advisor LLC. No amount is required to cure any outstanding defaults under the marketing services contract.

4.23 **Urban Elevator Service, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for elevator maintenance between the Debtor and Urban Elevator Service, LLC. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,760.00.*

Unless otherwise provided in this Plan (including section 4.11 hereof) or by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. Unless otherwise provided in this Plan (*e.g.*, section 4.11 and Class 9 hereof), all Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified for distribution purposes with Unsecured Vendor Claims and shall be treated in accordance with Class 8 in Article 3 hereof.

## ARTICLE 5
## IMPLEMENTATION OF THE PLAN

**General Settlement of Claims and Interests.** Except as otherwise provided herein, pursuant to Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.

5.1 To effectuate the proposed Plan, WMH shall continue its Hotel operations. WMH will utilize income from its operations, and cash on hand on the Effective Date (including $8 million in the proceeds of the Equity Auction) to fund the proposed Plan, and will also use funds from the Equity Auction in order to pay for necessary renovations and improvements, as well as to comply with Plan obligations.

5.2 Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) transfer to the Reorganized Debtor of $8 million from the proceeds of the Equity Offering; (2) issuance and distribution of the New Common Units; and (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Reorganized Debtor or any Unit Holders or members thereof.

5.3 The Debtor shall retain all property of the estate, with no transfer of estate property being anticipated at this time except as may be particularly set forth herein. The Debtor reserves its right to sell or transfer any of its property, with the proceeds to be distributed to lien holders according to their priorities.

5.4 Interest on all Allowed Secured Claims as provided in the Plan shall commence upon the Effective Date of the Plan, or as otherwise expressly set forth herein.

5.5 The Debtor may prepay any amount to any Class at any time without penalty.

5.6 No distributions of under $5.00 shall be made by the Debtor, and no payments shall be made on claims under that amount. Any distribution checks which have not been negotiated and cleared six months after their distribution may be cancelled by the Debtor without further liability for that distribution.

5.7 Unless otherwise agreed by the Debtor, all distributions shall be mailed to creditors at the addresses shown on the Debtor's schedules, except those creditors who have filed a Proof of Claim or notice of appearance in this action shall have their distribution checks sent to the address shown on the Proof of Claim if available, and if not, to the address for the notice of appearance. Any creditor may change the address for mailing of the distribution check by written notice to counsel for the Debtor. Any distribution checks properly sent to such addresses which are returned shall become the property of the Debtor without further liability for such distributions.

5.8 Confirmation of this Plan shall not preclude or estop the Debtor from pursuing any claims of the estate, including any Avoidance Actions, if any, nor any other clams against any of the Debtor's creditors for offset, except as may be expressly set forth herein.

5.9 **The Reorganized Debtor**. The Debtor shall emerge from Bankruptcy as the Reorganized Debtor with all of the rights, powers, duties and obligations set forth below.

a) **Vesting of all Property**. Except as expressly provided in this Plan, on the Effective Date, all assets of the Debtor's Bankruptcy Estate shall vest in the Reorganized Debtor.

b) **Governance, Powers and Duties.** On and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Court. The Reorganized Debtor shall also have the powers, duties and obligations set forth in this Plan. On and after the Effective Date, all actions required of the Debtor shall be taken by the Reorganized Debtor, or its designee, in the name of and on behalf of the Debtor and its bankruptcy estate. The Reorganized Debtor shall be authorized to execute documents on behalf of the Debtor and its bankruptcy estate. The duties, responsibilities and obligations of the Reorganized Debtor include, but are not limited to, all matters for which the Court is retaining jurisdiction, including the following:

- making distributions under the Plan;
- preparation and filing of tax returns, on behalf of the Debtor, its bankruptcy estate, including the right to request a determination of tax liability as set forth in Section 505 of the Bankruptcy Code;
- requesting and receiving of W-9 federal tax forms for any party who is entitled to receive a distribution on account of a Claim or Interest;
- prosecution and resolution of causes of action, if any, including any Avoidance Actions;
- Claims objections and reconciliation;
- Payment of any post-confirmation fees due to the Office of the United States Trustee; and
- The compromise and settlement of Claims, causes of action, and other proceedings and matters.

c) **Attorney Client Privilege to Extend to Reorganized Debtor.** The Reorganized Debtor shall stand in the same position as the Debtor with respect to any rights the Debtor may have to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Reorganized Debtor shall succeed to all of the Debtor's rights to preserve, assert or waive any such privilege.

d) **Retention of Professionals.** The Reorganized Debtor may retain such attorneys (including special counsel), accountants, advisors, expert witnesses, and other professionals as they shall consider advisable without

necessity of approval of the Court. Persons who served as professionals to the Debtor prior to the Effective Date may serve as professionals to the Reorganized Debtor. The fees and expenses of the Reorganized Debtor and professionals retained by them shall be paid by the Reorganized Debtor in the ordinary course of business and without Court review or approval.

e) **Causes of Action Retained and Preserved.** All causes of action that are not otherwise compromised, settled, released or waived pursuant to the terms of this Plan shall be retained by the Reorganized Debtor and preserved. Except as otherwise expressly provided in the Plan, the Reorganized Debtor retains all rights, claims, defenses, setoffs, recoupment and causes of action the Debtor or its estate may have against any third parties, and may pursue and/or enforce such retained rights, claims, defenses or causes of action in accordance with applicable non-bankruptcy law.

f) **Capital Gains Taxes.** Any taxes payable on capital gains realized by the Debtor as a result of the disposition of certain assets under the Plan, or by any person or entity contributing assets to the Debtor under the Plan, shall be paid when and as they become due.

g) **Bar Date and Resolution of Claims.** All holders of contested claims, including unpaid Administrative Claims and professional fees, must file with the Court their final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Effective Date and in accordance with the substantive and procedural requirements in the Bankruptcy Code. The Reorganized Debtor shall be responsible for the resolution of Claims, and shall have standing to object to the allowance of any Claim and to assert and prosecute any counterclaim relative thereto (without prejudice to any right of any other party in interest to do so under applicable law). All such objections and counterclaims shall be filed no later than one hundred eighty (180) daysafter the Effective Date, or within such further time as may be fixed by the Court.

h) **Unresolved Claims.** If on a date on which payments are made on account of the Allowed Claims of a given class, there exist any Unresolved Claims in such class, the amount of cash distributed to holders of Allowed Claims in that class shall be determined as if all Unresolved Claims were Allowed Claims in the full amount claimed by the holders thereof (or in such lesser amount as the Court determines by Final Order) and the Reorganized Debtor may, in such circumstances, hold in a separate reserve account the cash that would have been distributed to the holders of the Unresolved Claims for such class if the full amount of their Claims, or such lesser

amount as the Court determines, were Allowed Claims on such distribution date, or the Debtor may request the Court to waive such segregation of funds on the basis of evidence that the Debtor will have sufficient resources from operations and other sources to make required distributions to such persons holding Unresolved Claims. Interest earned on cash in the reserve account shall likewise be added to the balance of the reserve account, and will revert to the Reorganized Debtor after Unresolved Claims are determined, and distributions made on account therefor. To the extent that an Unresolved Claim becomes an Allowed Claim after payments are made on account of Allowed Claims in such class, the Reorganized Debtor shall, as soon as practicable thereafter, distribute to the holder of the newly Allowed Claim the amount of cash that such holder would have received to date had its Claim been an Allowed Claim as of the Effective Date. To the extent that all or a portion of any Unresolved Claims are disallowed, any excess funds held in the reserve account shall revert to the Reorganized Debtor.

5.10 **Equity Auction.**

a) In order to raise $8 million needed for exit financing, including for renovations, and to provide a cushion to protect against unknown future events which could negatively impact income from operations, the Debtor will move the Court under Code section 363 ("**363 Motion**") to conduct an auction sale of equity to be newly issued on the Effective Date ("**New Equity**"). At least $8 million ("**JSM Bid**") will be provided by JSM or its designee (together, "**JSM**"), through a committed subscription agreement as a lead or Stalking Horse Bidder. The Debtor may also later file a separate motion (the "**Marketing Motion**") to engage a professional firm to enhance the marketing of the New Equity acquisition opportunity.

b) The Debtor will file the 363 Motion for approval of Auction and Equity Sale Bidding Procedures on January 12, 2026, including for approval of the JSM Bid as Stalking Horse Bid, and bidding procedures (the "**Auction and Bidding Procedures**") which shall, among other things, govern the qualification requirements for potential competing bidders, and the submission of competing bids for the purchase of the New Equity. (If the Debtor determines to file the Marketing Motion, it shall be filed with sufficient time to be determined by the Court on or before the commencement of Plan confirmation hearings.) The principal terms of the JSM Bid and the Auction and Bidding Procedures for which approval will be sought in the 363 Motion are as follows:

1. **<u>Stalking Horse Bidder to Assure Capital Infusion of at least $8 million on the Effective Date</u>**. On or before the 363 Motion is filed,

JSM will have entered into a subscription agreement ("**New Equity Subscription Agreement**") to purchase the New Equity for $8 million on the Effective Date. These funds (and such higher amounts as may be bid if there is competitive bidding) shall be provided in the form of a loan to JSM from RFIC, an entity that is affiliated with an equity investor in JSM. On or before the 363 Motion is filed, RFIC will also have entered into a commitment to provide such loan to JSM, provided, however, that RFIC shall not obtain any ownership interest or equity in either JSM or the Debtor as a result of providing such loan.

2. **<u>Qualified Bidder Requirements</u>**. Anyone may submit a competing bid and participate in the auction, provided they first become a qualified bidder ("**Qualified Bidder**"). JSM is deemed to be a Qualified Bidder, subject to its provision of the Cash Deposit (defined below). The opportunity to bid by becoming a Qualified Bidder will be publicized with notices (the "**Public Notice Date**") in the national editions of the *New York Times* and the *Wall Street Journal*, as well as on internet sites that promote and publicize bankruptcy auctions. The requirements to become a Qualified Bidder ("**Qualified Bidder Requirements**") shall include (a) execution of a non-disclosure agreement to protect the confidentiality of information provided by the Debtor (and Marriott) for the purposes of bidder diligence, (b) a legally binding commitment to assume and ensure that the Reorganized Debtor complies with all the obligations set forth in the confirmed Plan, (c) a demonstration that the person seeking to bid is an "Accredited Investor" as defined in Regulation D of the Securities Act of 1933, (d) a demonstration to the satisfaction of the Debtor of the person's financial wherewithal to (X) close on a purchase of the New Equity for a minimum of $8,250,000 (the Stalking Horse Bid plus the first minimum competing bid increment) plus additional available liquidity of an additional 50% (or ability to pay a total of up to $12,375,000) to assure that the person seeking to bid at the auction can perform on such higher bids as it may elect to make up to $12,375,000, (Y) subject to Marriott's approval, which must be obtained prior to any scheduled Auction, provide an unlimited guaranty of the Debtor's obligations to Marriott, and (Z) pay for the difference between $8,000,000 and at least $10,250,000 of renovations expected to be required of a new owner as set forth in the June 4, 2025 Appraisal of the Milwaukee Marriott Downtown by LW Hospitality Advisors; (e) submission of a fully authorized (with evidence of due authorization) and executed New Equity Subscription Agreement, without condition or contingency other than approval of the sale by the Bankruptcy Court, in the amount of at least the $8,250,000 million required for a competing bid, (f) a cash deposit in the amount of twenty percent (20%) of the bid's proposed purchase price to a non-interest bearing escrow account of

Debtor's counsel (the "**Cash Deposit**"); and (g) a commitment to strictly adhere to all requirements of the applicable provisions of suchfranchise agreement as Marriott in its sole discretion may be willing to approve for a new owner of the Debtor's equity, including any Transfer of Controlling Ownership Interests (as such term is defined in the Marriott Franchise Agreement), change of Control (as such term is defined in the Marriott Franchise Agreement), or other Transfer (as such term is defined in the Marriott Franchise Agreement) provisions, as applicable. Among other things, this means that with respect to any person seeking to be a Qualified Bidder, such person must commit to the payment of required fees and costs as set forth in the Marriott Franchise Agreement, and to enter into all required agreements with Marriott, including, without limitation, any guaranty and property improvement plan to address any necessary renovations to the Hotel, if required by Marriott.

3. **Cash Deposits Not Property of the Estate**. All funds delivered in connection with the Equity Auction shall be deposited and held in a segregated account designated as Equity Auction Proceeds Account, pending the Effective Date, or as otherwise provided herein. Such funds shall not constitute property of the Debtor's estate. Prior to the Effective Date, any Equity Auction Excess Proceeds shall be transferred from the Equity Auction Proceeds Account to a segregated Excess Proceeds Account, and thereafter shall constitute property of the Debtor's estate. On the Effective Date, the Equity Auction Proceeds Account ($8 million) shall be released to the Reorganized Debtor and shall be used to fund necessary capital improvements, and otherwise generally for prospective Plan obligations and operations.

4. **Qualified Bidder Deadline**. There will be a 45-day period proposed from the Public Notice Date pursuant to paragraph 2 above to the deadline for a purchaser to become a Qualified Bidder ("**Qualified Bidder Deadline**"), in order to permit diligence by any such party interested in participating in the auction. Interested parties who wish to become Qualified Bidders shall have until the Qualified Bidder Deadline to review information related to the Debtor, provided that they have first satisfied at least the Qualified Bidder Requirements set forth in paragraphs 2(a)-(d) above. On or prior to the date that public notice is provided, the Debtor shall establish a virtual data room which shall be populated with historical financial information, and other available information as would customarily be reviewed by a potential purchaser. Any potential purchaser must enter into a non-disclosure agreement prior to being granted access to such virtual data room.

5. **<u>Cancellation of Auction</u>**. If at the Qualified Bidder Deadline, there are no Qualified Bidders other than JSM, then the Debtor shall cancel the auction, and JSM shall close on its acquisition of the New Equityon the Effective Date; provided that JSM shall strictly adhere to all applicable provisions of the Marriott Franchise Agreement (as amended and agreed by Marriott) prior to closing on its acquisition of the New Equity, and, to the extent the terms of the Marriott Franchise Agreement and the 363 Motion and/or Bidding Procedures conflict, the terms of the Marriott Franchise Agreement shall control and govern.

6. **<u>Conduct of Auction</u>**. If there are Qualified Bidders other than JSM, then 14 days after the Qualified Bidder Deadline (the "**Auction Date**"), the Debtor shall conduct a live auction (in person and via Zoom) of the New Equity at the offices of its counsel, Richman & Richman LLC, at 122 West Washington Avenue, Suite 850, Madison, WI 53703. The first bid of a Qualified Bidder other than JSM must be at least $8,250,000 . Thereafter, bids must exceed prior bids by at least $250,000.

7. **<u>Highest and Best Bid</u>**. Bids shall be in cash only, and the New Equity will be sold only in its entirety. The highest and best bid shall be the bid of a Qualified Bidder that is the highest at the end of the Auction. At the conclusion of the Auction, the Debtor, subject to the Bankruptcy Court's approval, shall determine (i) which bid constitutes the highest or best offer (the "**Winning Bid**"); and (ii) the next highest or best bid (the "**Back-Up Bid**"). The Winning Bidder or the Back-Up Bidder, as applicable (each to the extent approved by the Bankruptcy Court) and the Debtor must each strictly follow all applicable procedures and requirements in the Marriott Franchise Agreement, including any Transfer of Controlling Ownership Interests (as such term is defined in the Marriott Franchise Agreement), change of Control (as such term is defined in the Marriott Franchise Agreement), or other Transfer (as such term is defined in the Marriott Franchise Agreement) provisions, as applicable, following approval by the Bankruptcy Court of any New Equity sale and prior to closing on any acquisition of the New Equity.

8. **<u>Required Approvals by Marriott</u>**. Following the Auction, and the Court's approval of the sale as provided in paragraph 13, below, any person other than JSM who has any Winning Bid or Backup Bid shall have sixty (60) days, or such additional time, not to exceed another sixty (60) days, as Marriott may reasonably require in its sole discretion to complete its approval process, to obtain Marriott's approval in connection with the applicable procedures and requirements in the Marriott Franchise Agreement set forth in paragraph 8, above. In the event that a Winning Bidder or Backup Bidder fails to obtain Marriott's

approval as provided herein, their Cash Deposit shall be forfeited to the estate, and the prevailing bid shall be adjusted to the highest amount that was submitted by such prevailing bidder before the first bid made by the person who failed to obtain Marriott's approval.

9. **Additional Auction Rules**. The Debtor may announce additional procedural rules for the submission of bids that are reasonable under the circumstances, so long as such rules are not inconsistent with these Bidding Procedures and subject to the review of the Bankruptcy Court.

10. **Excess Sale Proceeds to be Distributed to Unsecured Creditors and Existing Interest Holders**. To the extent the Winning Bid exceeds $8,000,000 (net of marketing expenses, including the fees and expenses of any professional firm engaged pursuant to the Marketing Motion), all such excess cash shall be held by the Debtor in the Excess Proceeds Account pending final disposition of the White Lodging Claims and any other Claims objections, and will thereafter be distributed to the Holders of Allowed Unsecured Claims in Classes 5, 6, 7, and 8 on a pro rata basis, in addition to the distributions previously made and provided in this Plan. If total distributions of such Excess Sale Proceeds would exceed 100% of the Allowed amount of such Claims, they shall be treated as a prepayment of and in lieu of any scheduled distributions yet to be made, and capped at 100% of the Allowed amount of such Claims. In the event that all Allowed Unsecured Claims are paid in full on the basis of the foregoing, and Excess Sale Proceeds remain, the Unsecured Creditors in Classes 5, 6, 7, and 8 will then be paid interest at the rate of 320 basis points above the yield on five-year Treasury securities as reported by the United States Department of the Treasury as of the Effective Date (if today, approximately 6.9%) from the Effective Date to the date of full payment. If Excess Sale Proceeds remain after the prior distributions above, they shall be distributed on the same basis, including interest if paid in full, to the Holders of Allowed Unsecured Claims in Class 9. If Excess Sale Proceeds remain after that, they shall in their entirety and without limitation be distributed to Existing Equity Holders in Class 10. Where the Winning Bid is made by a party other than JSM, JSM shall have standing to continue to prosecute any objections then pending or as may be made to unsecured claims, in order to protect its residual interest in Excess Sale Proceeds, because in such circumstances it will be the principal economic beneficiary of any Claims objections that are sustained.

11. **Consent to Jurisdiction**. All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the United States Bankruptcy Court for the Eastern District of Wisconsin and waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of the New Equity Purchase Agreements.

12. **Sale Approval Hearing**. The Court shall conduct a hearing to approve the New Equity sale, and including in the event JSM is not the winning bidder, the assumption by the Winning Bidder and agreement to all the obligations under the Plan, pursuant to the Auction results, as soon after the Auction Date as the Court can accommodate on its calendar.

13. **Disposition of Cash Deposits**. Promptly after the Bankruptcy Court's entry of an order approving the sale of the New Equity, the Cash Deposits submitted by all Qualified Bidders (other than the Winning Bidder and the Back-Up Bidder) shall be returned to the respective Qualified Bidders. The Cash Deposit of the Winning Bidder shall be applied to the sale price set forth in the Winning Bidder's New Equity Subscription Agreement. If the Winning Bidder fails to consummate the purchase of the New Equity, including that it failed to obtain the approval of Marriott as provided above, the Cash Deposit of such Winning Bidder shall be forfeited to the Debtor. Notwithstanding this forfeiture, the Debtor specifically reserves the right to seek all additional available damages from any defaulting Winning Bidder. In the event the Winning Bidder does not close on the sale of the New Equity, the Debtor shall sell the New Equity to the Back-Up Bidder pursuant to its New Equity Subscription Agreement, provided that the Back-Up Bidder has obtained Marriott's approval as provided above. The Debtor will retain the Back-Up Bidder's Cash Deposit until the sale to the Winning Bidder closes, and the Back-up Bidder shall remain obligated to close a sale transaction with the Debtor based on the Back-Up Bidder's New Equity Subscription Agreement until the Sale to the Winning Bidder closes. Within seven (7) calendar days of the closing of the sale to the Winning Bidder, the Debtor shall return the Deposit to the Back-Up Bidder.

5.11 **Securities Laws Matters.**

The New Common Units shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code or, to the extent section 1145 is unavailable, pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. The Common Units issued pursuant to section 1145 of the Bankruptcy Code may be resold without registration under the

Securities Act or other federal securities laws pursuant to the exemption provided by section 1145(c) of the Bankruptcy Code, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

For any Common Units issued to Holders who may be deemed "underwriters" under section 1145(b) of the Bankruptcy Code, the Reorganized Debtor will rely on the exemption from registration provided by section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Such Equity Offering Shares will be "restricted securities" subject to resale restrictions under applicable securities laws and will bear a legend to that effect. Holders of such restricted securities may resell their securities pursuant to Rule 144 under the Securities Act or another available exemption from registration, subject to the restrictions on transfer set forth in the Amended Operating Agreement.

5.12 **New Organizational Documents.**

On the Effective Date, the New Organizational Documents shall become effective and shall replace the existing organizational documents of the Debtor. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance by the Reorganized Debtor of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate its New Organizational Documents, as permitted by Wisconsin law. If there is no change in Debtor's ownership through the Equity Auction, the Reorganized Debtor shall continue to be managed by JSM without compensation, except that fees may continue to be earned pursuant to the asset management agreement of JS Asset Management which will be assumed as provided above.

The New Organizational Documents shall, among other things:

(a) Authorize the issuance of the New Common Units;
(b) Set forth the rights and privileges of each holder of Common Units, including voting rights and distribution rights;
(c) Include provisions requiring the approval of holders of specified percentages of Common Units for certain corporate actions, including:
    i. Amendments to the New Organizational Documents;
    ii. Issuance of additional equity securities;
    iii. Mergers, consolidations, or sales of all or substantially all assets;
    iv. Dissolution or liquidation; and
    v. Related party transactions above specified thresholds.
(d) Establish preemptive rights allowing holders of New Common Units to maintain their percentage ownership in the Reorganized Debtor in connection with future equity issuances; and

(e) Include transfer restrictions designed to ensure compliance with applicable securities laws.

## ARTICLE 6
## CONFIRMATION REQUIREMENTS AND PROCEDURES

6.1 **Acceptance of the Plan.** The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is accepted by all impaired classes of Claims and Interests entitled to vote for or against the Plan or, if rejected by an impaired class, that the Plan is accepted by at least one impaired class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, OTHER THAN THE ACCEPTANCE OF ALL IMPAIRED CLASSES, THE PLAN PROPONENTS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) "CRAMDOWN" REQUIREMENTS HAVE BEEN SATISFIED.**

## ARTICLE 7
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

7.1 **Conditions to Confirmation**. The Plan shall not be confirmed unless and until each of the following conditions have occurred or have been waived in writing by the Debtor:

A. The Disclosure Statement Order has been entered by the Bankruptcy Court; and

B. The Bankruptcy Court enters the Confirmation Order in form and substance acceptable to the Debtor.

7.2 **Withdrawal of the Plan.**

A. Withdrawal Right. Notwithstanding anything contained in this Plan to the contrary, the Debtor reserves the absolute right, in its sole discretion, to withdraw this Plan at any time prior to the entry of the Confirmation Order by the Bankruptcy Court. Such withdrawal may be effectuated by filing a notice of withdrawal with the Bankruptcy Court and serving such notice on all parties entitled to notice under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the Bankruptcy Court.

B. Effect of Withdrawal. In the event of such withdrawal, this Plan shall be deemed null and void in its entirety and of no force or effect, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or Entity, or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor.

C. No Prejudice. The withdrawal of this Plan shall not prejudice the Debtor's right to request Court approval to file a subsequent plan of reorganization or liquidation, nor shall such withdrawal constitute a waiver of any rights, claims, or defenses of the Debtor.

7.3 **Conditions to Effective Date**. The Effective Date shall occur only if the Conditions to Confirmation have been satisfied, and the Debtor has cash from all available sources sufficient to make all payments required to be made on the Effective Date, unless the recipients of any payment required under the Plan agree in writing to receive a deferred payment, and the following further conditions are met (unless waived in writing by the Debtor):

a. **Equity Auction.** The Equity Auction must be successfully concluded, such that the sale of new Common Units may be consummated at the Effective Date closing.

b. **Option 1C Funding**. In the event that Class 1 elects treatment under Option 1C, the Bond Purchaser must effectuate and close on the acquisition of the Bonds or the WHEDA Loans (as it may elect).

c. **New Management Agreement**. The Debtor must have a new or amended management agreement in effect with a management company on or before the Effective Date. This is expected to be with either White Lodging or Avion Hospitality.

d. **Franchise Agreement**. The Debtor must have Court approval to assume the Marriott Franchise Agreement with Marriott International as the parties have agreed to amend it. A motion for such approval is currently pending [Doc 644]. In the event that JSM is not the Winning Bidder at the Equity Auction, the Debtor and Marriott must agree to the terms of a "new owner" franchise agreement, and the Court must approve the Debtor's entry into such franchise agreement.

7.4 **Waiver of Conditions**. The Conditions to Confirmation and the Effective Date set forth in this Article 7 may be waived by the Debtor without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## ARTICLE 8
## EFFECT OF CONFIRMATION OF PLAN

8.1 **Release and Discharge of Debtor.** Except as may be otherwise expressly provided in this Plan, the confirmation of this Plan (subject to the occurrence of the Effective Date) will discharge the Debtor from any Claim that arose before the Confirmation Date and any Claim of the kind specified in 11 U.S.C. §§ 502(g), 502(h), or 502(i), whether or not a Proof of Claim is filed or deemed filed, whether or not such Claim is Allowed, and whether or not the Holder of such Claim has voted on this Plan.

a. **Exculpation**. The Debtor, its agents, managers, financial advisors, attorneys, accountants, and other professionals, to the maximum extent permitted by applicable law, are released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of this Chapter 11 Case, including, but not limited to, the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; and other actions taken in furtherance of the Plan from the Petition Date up to the Effective Date. The exculpation does not cover claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct, or to any post-Effective Date obligations of the Reorganized Debtor.

b. **Injunction.** Commencing on the Effective Date, except as expressly provided otherwise in this Plan, the holders of all Claims shall be enjoined from asserting against the Debtor and Reorganized Debtor, or its assets and property, any other or further liabilities, liens, obligations or claims, including, but not limited to, all principal and accrued and unpaid interest on the debts of the Debtor, based on any act or omission, transaction, or other activity or security interest, or other agreement of any kind or nature of agreement occurring, arising or existing prior to the Confirmation Date that was or could have been the subject of any claim, whether or not allowed. All legal or other proceedings or actions seeking to establish or enforce liabilities, liens, claims, or obligations of any nature against the Debtor or assets or properties received or retained by the Reorganized Debtor with respect to debts and obligations, if any, of the estate, arising before the Confirmation Date, shall be permanently stayed and enjoined, except as may otherwise be specifically provided for in this Plan.

8.2 **Binding Effect.** The provisions of the Plan, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plans, any person acquiring the equity of the Reorganized Debtor, and any Creditor of the Debtor, whether or not the Claim of such Creditor is Impaired under the Plan and whether or not such Creditor has accepted the Plan.

8.3 **Closing the Bankruptcy Case.** Upon substantial consummation of the Plan, the Debtor may apply for an order closing the case.

8.4 **Reopening of the Bankruptcy Case.** The case may be reopened to administer assets, to grant the Reorganized Debtor other relief, including but not limited to, a discharge, to seek conversion or dismissal upon occurrence of a subsequent material default under the Plan, to hear and resolve any matter or proceeding over which the Court has retained jurisdiction, or for other cause.

## ARTICLE 9
## MODIFICATION OF THE PLAN

The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, in its sole discretion, to move the Bankruptcy Court for authority to amend or modify the Plan at any time prior to the entry of the Confirmation Order. *Upon and after entry of the Confirmation Order*, the Debtor may also, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder and the votes of each Class for or against the Plan shall be counted and used in connection with the modified plan of reorganization. The Debtor reserves the right to amend any exhibits or schedules to the Plan, whereupon each such amended exhibit or schedule shall be deemed substituted for the original of such exhibit.

After the Confirmation Date, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among the Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the Claim or Equity Interest of such Holder hereunder.

## ARTICLE 10
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The Debtor has not sought or obtained rulings from the Internal Revenue Service or any state or local taxing authority with respect to the tax consequences, if any, of the Plan and the transactions contemplated under either of the foregoing. **CREDITORS AND EQUITY HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS OF THE CONSUMMATION OF THE PLAN.**

## ARTICLE 11
## RETENTION OF JURISDICTION BY THE COURT

After the Confirmation Date, the Court may retain jurisdiction, and if the case is closed reopen it, for the following purposes, or as otherwise permitted by law:

11.1 **Objections to Claims.** To hear and determine any objections to the allowance of Claims, and requests for the estimation or liquidation of Claims.

11.2 **Fee Applications.** To hear and determine any and all applications for compensation of professional services and disbursements.

11.3 **Avoidance Actions.** To hear and determine any Avoidance Action or other proceedings to set aside (or preserve for the benefit of the Estate) or recover any property under applicable provisions of the Bankruptcy Code or other federal or state law.

11.4 **Recover Estate Assets.** To recover all assets of the Estate, wherever and however located.

11.5 **Pending Matters.** To hear and determine any pending applications, motions, adversary proceedings, and other contested matters not resolved by the Plan.

11.6 **Modification of the Plan.** To modify the Plan to the extent permitted by the Plan, the Court, and the applicable provisions of Section 1127 of the Bankruptcy Code.

11.7 **Enforcement of Payments, Rights and Interests.** To enforce the terms and provisions of payments, rights and interests required or created by the Plan.

11.8 **Executory Contracts and Unexpired Leases.** To hear and determine all Claims or controversies arising from the assumption or the rejection of any executory contracts or unexpired leases and to consummate their assumption or rejection.

## ARTICLE 12
## GENERAL PROVISIONS

12.1 **Definitions and Rules of Construction.** The definitions and rules of construction stated in sections 101 and 102 of the Bankruptcy Code apply when terms defined or construed in the Bankruptcy Code are used in the Plan.

12.2 **Captions and Headings.** The article and section headings used in the Plan are for convenience and reference only, and they do not constitute a part of the Plan or in any manner affect the terms, provisions, or interpretations of the Plan.

12.3 **Severability.** Should any term or provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of the Plan; provided, however, that this provision shall not be applied or interpreted so as to defeat the primary purpose of the Pan, which is to restructure the Debtor's obligations to its Creditors according to the treatment afforded to their Claims under the Plan.

12.4 **Governing Law.** Except to the extent that the Bankruptcy Code or other provisions of federal law are applicable, the rights and obligations arising under the Plan in any documents, agreements, and instruments executed in connection with the Plan (except to the extent such documents, agreements and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin.

12.5 **Successors and Assigns.** The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

12.6 **Approval of Payments for Certain Services.** All payments made or to be made by the Debtor for services or for costs and expenses in connection with this case, or in connection with the Plan and incident to this case, have been approved by, or are subject to, the approval of the Court, as reasonable.

12.7 **Payment of Quarterly Fees.** All quarterly fees payable under 29 U.S.C. § 1930 shall be paid on or before the Effective Date, as required by 11 U.S.C. § 1129(a)(12). The Reorganized Debtor shall continue to file quarterly fee statements and pay quarterly fees when due until this case is converted, dismissed or closed. The Bankruptcy Court shall retain the jurisdiction necessary to enforce the provisions of this paragraph.

12.8 **No Liquidation or Further Reorganization.** Confirmation of this Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under this Plan.

12.9 **Retirement Benefits.** The Debtor has no retirement benefits which are required to be continued under 11 U.S.C. § 1129(a)(13).

## ARTICLE 13
## CONCLUSION

The proposed Plan set forth herein reflects the Debtor's best efforts to reorganize in an orderly fashion. The Plan attempts to provide payment to secured creditors equal to the value of their respective collateral, and attempts to provide a substantially greater dividend to unsecured creditors than they are likely to receive if the Debtor liquidated its assets.

This Plan deals fairly and equitably with all of the Debtor's Creditors, and approval of this Plan is in the best interests of the Debtor, its estate, and its Creditors.

Dated this 12th day of January, 2026.


**RICHMAN & RICHMAN LLC**
**Attorneys for Debtor**

By: *\/s/ Michael P. Richman*

Michael P. Richman
Claire Ann Richman
Eliza M. Reyes
122 West Washington Avenue, Suite 850
Madison, WI 53703
Tel: (608) 630-8990/Fax: (608) 630-8991
mrichman@RandR.law
crichman@RandR.law
ereyes@RandR.law

So Ordered.

Dated: October 22, 2026

G. Michael Halfenger
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Wisconsin & Milwaukee Hotel LLC, Case No. 24-21743-gmh
Chapter 11

Debtor.

Address: 731 North Jackson Street, Suite 420
Milwaukee, WI 53202

Employer's Tax Identification No.: 45-2686995

**AMENDED ORDER CONFIRMING THE DEBTOR'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

I

On October 9, 2026, the court entered an order confirming debtor Wisconsin & Milwaukee Hotel LLC's fourth amended chapter 11 plan of reorganization dated January 12, 2026. ECF No. 1105. The confirmation order attached a copy of the January 12, 2026 fourth amended plan (ECF No. 853) to the order. ECF No. 1105.

On October 21, 2026, the debtor filed a letter raising an issue with the order's attachment of ECF No. 853, the January 12 fourth amended plan. ECF No. 1111. The issue arises from the fact that on February 3, 2026, after the court had approved the disclosure statement and ordered the debtor to serve it and the fourth amended plan on

all parties in interest, the debtor filed a letter asking the court to allow it "to substitute [ ] two corrected pages to the Disclosure Statement (and the Plan exhibit thereto) . . . and to the Plan itself"; the February 3 letter reported that the debtor had failed to include the $81,502.10 amount of a claim held by creditor J.M. Brennan, Inc. (JMB) in Class 8 and the debtor desired to include "corrected" "pages providing treatment of Class 8 – Vendor Unsecured Claims to make clear that JMB's Claim is treated in that class, and the amount of its Claim has been added to the respective total Claims for the Class." ECF No. 896, at 1. The court granted the debtor's request at a hearing held two days later; the resulting minute order directed the debtor to "amend the second amended disclosure statement and fourth amended chapter 11 plan as proposed in its February 3 letter, and . . . serve those revised documents as provided in the February 3 order." ECF No. 905, at 2 (emphasis omitted). On February 10, 2026, the debtor filed a certification that it has served the approved disclosure statement and fourth amended plan (ECF No. 907), but it never filed a corrected fourth amended plan. When the court entered its October 9 confirmation order attaching the fourth amended plan, it overlooked the corrections.

In addition to pointing out the oversight, the October 21 letter represents that the debtor served the corrected plan and corrected disclosure statement on February 9, 2026, but "inadvertently neglected subsequently to file the Plan document that incorporated the February 3 Errata." ECF No. 1111, at 1. The October 21 letter is accompanied by a copy of the corrected fourth amended plan that (confusingly) includes the court's footer for ECF document number 853, which is the fourth amended plan as originally filed on January 12, 2026. The debtor filed the corrected fourth amended plan as a separate docket entry on October 21, 2026 (ECF No. 1112); that document also bears the original footer from docket entry 853.

II

Federal Rule of Civil Procedure 60(a) allows "[t]he court [to] correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a

judgment, order, or other part of the record" and "[t]he court may do so on motion or on its own, with or without notice." The record shows that because of oversight, the court attached a copy of the uncorrected fourth amended plan to the October 9 confirmation order without mentioning the debtor's subsequent corrections. For that reason, the court amends that order pursuant to Rule 60(a) as follows to correct the error.

IT IS ORDERED:

1. The October 9, 2026 confirmation order is amended to provide that the fourth amended chapter 11 plan of reorganization of Wisconsin & Milwaukee Hotel filed on January 12, 2026, as subsequently corrected pursuant to the court's February 5, 2026 oral direction, subsequently memorialized by the minute order entered at ECF No. 905, is confirmed.
2. A copy of the confirmed plan is attached.
3. The October 9, 2026 opinion's description of Class 8 is revised to conform to the revisions to Class 8 contained in the confirmed chapter 11 plan attached to this amended order, including, specifically, ECF No. 1104, page 53, line 13 "approximately $283 thousand" is changed to "$324,500", and page 53, line 14 "$28,350" is changed to "$32,450". See, e.g., ECF No. 1104, at 53.
4. This order is effective as if it were entered on October 9, 2026.

# # # # #

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

In re:

Wisconsin & Milwaukee Hotel LLC,

Case No. 24-21743-gmh
Chapter 11

Debtor.

---

# FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WISCONSIN & MILWAUKEE HOTEL LLC DATED JANUARY 12, 2026

---

This Fourth Amended Chapter 11 Plan of reorganization (the "**Plan**") is proposed by Wisconsin & Milwaukee Hotel LLC (the "**Debtor,**" the "**Hotel**," or "**WMH**") pursuant to section 1121 of chapter 11 of the Bankruptcy Code. The Plan provides for the reorganization of the Debtor, and an auction and sale of the equity ("**Equity Sale**") of the reorganized Debtor in order to raise $8,000,000 for necessary renovations and to provide a cushion against any potential shortfalls in operations revenues to assure that the Debtor will meet the financial obligations of this Plan. Reference is made to the Second Amended Disclosure Statement of January 12, 2026 accompanying this Plan for a discussion of the Debtor's history, business, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters.

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

A. For purposes of this Plan, the following terms shall have the respective meanings set forth below:

1.1. "**Administrative Expense Claim**" means a Claim for costs and expenses of administration of this Case and allowed under sections Section 503(b), 507(a)(2), and 507(b) of the Code that is entitled to priority in payment pursuant to Section 507(a)(1) of the Code, and includes, without limitation, (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the estate and operating the Debtor's business, and (b) allowed professional fee claims. For purposes of this Plan, Administrative Expense Claim also means all cure amounts required to be paid pursuant to Section 365(b) of the Code.

1.2. "**Allowed Claim**" means a Claim or Interest that is evidenced by a Proof of Claim or Interest which is filed timely pursuant to Section 501 of the Bankruptcy Code and/or which is allowed pursuant to Section 502 of the Bankruptcy Code, a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim or Interest, as applicable, has been timely filed, or a Claim or Interest that is Allowed by Final Order of the Bankruptcy Court.

1.3. "**Amended Operating Agreement**" means that certain amended and restated operating agreement of the Debtor to be executed on the Effective Date by and among the holders of New Common Units, which shall set forth the rights and obligations of the holders of New Common Units with respect to corporate governance matters and which shall be included in the Plan Supplement.

1.4. "**Auction and Bidding Procedures**" has the meanings set forth in section 5.10 of this Plan.

1.5. "**Avoidance Actions**" shall mean any claims or causes of action of the Debtor's estate commenced, or that may be commenced, before or after the Effective Date pursuant to Chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550, 551, or 553.

1.6. "**Ballot**" means the form(s) distributed to holders of impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

1.7. "**Bankruptcy Code**" or "**Code**" means Title 11 of the United States Code as it exists, or as may be hereafter amended.

1.8. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure which have been promulgated and made effective as of August 1, 1983, together with any amendments and modifications thereto.

1.9. "**Bar Date**" means June 21, 2024.

1.10. "**Business Day**" means any day other than a Saturday, Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

1.11. "**Case**" or "**Chapter 11 Case**" means *In re Wisconsin & Milwaukee Hotel LLC,* Chapter 11 Case No. 24-21743-gmh, captioned above.

1.12. "**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

1.13. "**Claimant**" means the holder of a claim.



Case 24-21743-gmh Doc 853 Filed 01/12/26 Page 2 of 76
Case 2:26-cv-01974-LA Filed 10/23/26 Page 46 of 80 Document 1

1.14. "**Class**" means a category of holders of claims or interests which are substantially similar to other claims or interests in such class and which category has been segregated for treatment as part of this Plan pursuant to Section 1222(b) of the Bankruptcy Code.

1.15. "**Code**" means the United States Bankruptcy Code, 11 U.S.C. title 11.

1.16. "**Common Units**" means the New Equity voting common membership interests of the Reorganized Debtor to be issued to JSM or such other person who is deemed the Winning Bidder and successfully closes on the acquisition following the Equity Auction, and shall have such distribution rights, and other rights, preferences, and privileges as set forth in the Amended Operating Agreement.

1.17. "Conditions to the Effective Date" means the conditions described in Section 7.3 of this Plan.

1.18. "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Court.

1.19. "**Confirmation Order**" means the order of the Court confirming this Plan.

1.20. "**Counterparty**" means a person or entity that is party to an Executory Contract to which the Debtor is also a party.

1.21. "**Court**" means (a) the United States Bankruptcy Court for the Eastern District of Wisconsin (the "**Bankruptcy Court**"), in which the Debtor's chapter 11 case is pending pursuant to a referral of jurisdiction by the United States District Court for the Eastern District of Wisconsin, (b) any court having competent jurisdiction to enter Final Orders or judgments, conduct *de novo* review of issues and withdraw any portion of the above-captioned proceeding from the Bankruptcy Court, and (c) any court having competent jurisdiction to hear appeals or *certiorari* proceedings from any of the foregoing.

1.22. "**Creditor**" means any person or its assignee that holds a Claim against the Debtor for unsecured debts, liabilities, demands, or Claims of any character whatsoever, including any under-secured creditors.

1.23. "**Debt**" means liability on a Claim.

1.24. "**Debtor**" means Wisconsin & Milwaukee Hotel LLC, the Debtor in this Chapter 11 case.

1.25. "**Discharge**" means an order of the Court pursuant to 11 U.S.C. § 1141(d).


Case 24-21743-gmh Doc 11 Entered 10/22/26 16:34:28 Page 3 of 39 (overlapping stamp, partly illegible)

1.26. "**Disclosure Statement**" means the "Second Amended Disclosure Statement relating to this Plan, including, all schedules, supplements, and exhibits thereto, as approved by the Bankruptcy Court pursuant to Section 1125.

1.27. "**Disclosure Statement Order**" means a Final Order finding that the Disclosure Statement contains adequate information pursuant to Section 1125.

1.28. "**Effective Date**" means the date on which the Plan shall take effect, which shall be a Business Day after the Confirmation Date, selected by the Debtor, on which: (a) no stay of the Confirmation Order is in effect; and (b) all Conditions to the Effective Date specified in Article 7 below have been satisfied or waived.

1.29. "**Equity Auction**" means the auction sale of New Equity to be conducted pursuant to the Auction and Bidding Procedures and 363 Motion for at least $8,000,000.

1.30. **"Equity Auction Excess Proceeds"** means proceeds (net of any marketing expenses) of the Equity Auction that exceed $8 million.

1.31. "**Estate**" means the estate of the Debtor created pursuant to section 541 of the Code.

1.32. "**Executory Contracts**" has the meaning given in Section 365, and includes unexpired leases. "**Existing Equity Holders**" means Holders of Equity Interests in the Debtor as of the Petition Date.

1.33. "**Existing Equity Interests**" means all issued and outstanding Equity Interests in the Debtor as of the Petition Date.

1.34. "**Final Order**" means an order or judgment of the Court that has not been reversed, stayed, modified, or amended, and that is no longer subject to appeal, *de novo* review or *certiorari* proceeding, and as to which no appeal, *de novo* review or *certiorari* proceeding is pending.

1.35. "**Impaired**" means, with respect to a Claim or Class of Claims, "impaired" within the meaning of section 1124.

1.36. "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating

to, or whose value is related to, any such interest or other ownership interest in the Debtor.

1.37. "**JSM**" means Jackson Street Management, LLC, the owner of 99.99% of the Debtor's existing Equity, and the Debtor's managing member.

1.38. "**JSM Bid**" means the legally binding commitment by JSM or its designee, pursuant to the New Equity Subscription Agreement, to acquire the New Equity for $8 million on the Effective Date.

1.39. "**Lenders**" means Computershare Trust Company, N.A., as trustee ("**Computershare**") and Wisconsin & Milwaukee Hotel Funding, LLC ("**WMH Funding**").

1.40. "**Lien**" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.41. "**New Equity**" means the Common Units.

1.42. "**New Equity Subscription Agreement**" means that certain agreement to purchase New Equity, as described in section 5.10 of this Plan, the form of which shall be included in the Plan Supplement.

1.43. "**New Organizational Documents**" means the organizational and governance documents for the Reorganized Debtor, including, without limitation, articles of organization, the Amended Operating Agreement, or other similar documents, which shall be consistent with the terms of this Plan, and shall be included in the Plan Supplement.

1.44. "**Petition Date**" means April 9, 2024, the date on which the voluntary petition was filed by the Debtor commencing this Case, resulting in the entry of an order for relief.

1.45. "**Plan**" or "**Plan of Reorganization**" means this Plan, all addenda, exhibits, schedules, releases or other attachments hereto, and shall include any subsequent amendments or modifications of this Plan filed either before or after the Confirmation Date.

1.46. "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which will be Filed by the Debtor contemporaneously herewith, and such additional documents as may be filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement, including the following: (a) the New Organizational Documents; (b) the New Equity Subscription Agreement; (c) the RFIC Loan

Commitment; and (d) any other necessary documentation related to the Plan and the Equity Auction. The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the terms of this Plan. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in the Plan.

1.47. "**Priority Claim**" means a Claim, other than an Administrative Expense Claim, entitled to priority under section 507 of the Code.

1.48. "**Pro Rata**" means the same proportion that an Allowed Claim in a particular class bears to the aggregate amount of all Allowed Claims in such class.

1.49. "**Reorganized Debtor**" means the Debtor, as reorganized, pursuant to and under the Plan, on and after the Effective Date.

1.50. "**RFIC**" means Reiman Family Investment Company, LLC, an investor in JSM and the lender to JSM under the RFIC Loan Commitment.

1.51. "**RFIC Loan Commitment**" means that certain agreement to be executed by and between RFIC and JSM, and related promissory note, pursuant to which RFIC will loan to JSM at least $8 million in order that JSM may be the Stalking Horse Bidder at an Equity Auction of the New Equity, and consummate the JSM Bid. The RFIC Loan Commitment shall be filed as part of the Plan Supplement.

1.52. "**Section**" refers to a section of the Code.

1.53. "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Debtor has an interest.

1.54. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

1.55. "**Security**" means a security as defined in section 2(a)(1) of the Securities Act.

1.56. "**Stalking Horse Bidder**" means JSM pursuant to the JSM Bid.

1.57. "**363 Motion**" means the motion that the Debtor will file on or before January 12, 2026, seeking approval of the Equity Auction Sale and Bidding Procedures, and as further described in section 5.10 of this Plan.

1.58. "**Unimpaired**" means, with respect to a Claim or Class of Claims, not "impaired" within the meaning of section 1124.

1.59. "**Unsecured Claim**" means a Claim that is not secured by a Lien on property in which the Debtor or an entity in which Debtor is a member has an interest.

1.60. "**Winning Bid" and "Winning Bidder**" means the bid and person, respectively that is determined by the Debtor, at the conclusion of the Equity Auction, to have presented the highest and best bid.

B. **Additional Rules of Interpretation**.

1. **Undefined Terms**. Terms not defined in this Plan that are defined in the Code shall have the meanings stated in the Code. For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; and (i) "$" or "dollars" means United States dollars.

2. **Nonseverability of Plan Provisions.** If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified

without the Debtor's or Reorganized Debtor's consent, as applicable; and (c) nonseverable and mutually dependent.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND INTERESTS

The Debtor's Plan provides for payment of all Allowed Claims that are also Secured Claims, to the extent they are allowed, and Priority Claims, and a distribution to all Allowed Claims that are Unsecured Claims. Where applicable, the amortization on these obligations has generally been designed to provide adequate cash flow for prospective business operations, and to service debt and other obligations under this Plan. The classes of claims designated and treated under the Plan for Allowed Claims are as follows:

2.1 **CLASS 1 (and Options 1A, 1B and 1C)** - Secured Claim of Computershare Trust Company, N.A., as trustee ("**Computershare**").

2.2 **CLASS 2** – Secured Claim of Wisconsin, Milwaukee & Hotel Funding LLC ("**WMH Funding**").

**2.3** **CLASS 3** - Secured Claim of J.M. Brennan, Inc. ("**JMB**")

2.4 **CLASS 4** – Priority Unsecured Claim of US Foods, Inc. ("**US Foods**").

2.5 **CLASS 5** – Unsecured Claims of White Lodging Services Corporation ("**White Lodging**").

2.6 **CLASS 6** – Unsecured Claim of Computershare.

2.7 **CLASS 7** – Unsecured Claim of WMH Funding.

2.8 **CLASS 8** – Unsecured Vendor Claims.

2.9 **CLASS 9** -- Unsecured Claims of JSM and Wave Renovations

2.10 **CLASS 10** – Equity Interests of the Debtor.

## ARTICLE 3
## TREATMENT OF CLAIMS AND INTERESTS

3.1 **Administrative Expense Claims.** Administrative Expense Claims include all costs and expenses of the administration of the Debtor's case allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(1) thereof. The Plan provides for payment in full of all allowed

administrative expenses on the effective date of the Plan, unless other treatment is specifically set forth in the Plan. Administrative Expense Claims include fees of professionals employed by the Debtor, including attorneys, appraisers, and accountants, and quarterly UST fees (discussed under Statutory Fees below). The Debtor estimates that at the Effective Date of Plan Confirmation, there will be approximately $1,606,000 in unpaid administrative expense claims comprising professional fees, the contract assumption cure amounts set forth in Article 4 below, and an amount to be reserved for the payment of the White Lodging Administrative Expense Claim, which is pending determination of the Debtor's Motion for Reconsideration of May 15, 2025 Order Granting in Part White Lodging Services Corporation's Motion for Allowance of Administrative Expense Claim [Doc 563]. If this motion is not resolved or otherwise settled prior to the Effective Date, then on the Effective Date the Debtor shall continue to reserve the disputed amount in a segregated account pending such final resolution or settlement.

3.2 **Statutory Fees**. On or before the Effective Date, cash shall be disbursed on account of fees payable under 28 U.S.C. § 1930 in an amount equal to the amount of any such fees. Notwithstanding any other provisions in this Plan to the contrary, the Debtor shall remain obligated to pay fees pursuant to 28 U.S.C. § 1930 until such time as the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

3.3 **CLASS 1 – Secured Claim of Computershare.**

Computershare filed Claim 11 in the total amount of $48,606,171.63. The Debtor has herein allowed $44,546,698,48, consisting of $45,553,800.86 (per agreementless adequate protection payments of $1,007,102.38 from the Petition Date through January 2, 2026) as the aggregate amount of such Claim (the "**Aggregate Claim**").[1] On July 25, 2025, the Court determined that the value of the Hotel collateral securing Claim 11 was $26,000,000 [Doc 697]. Thus, in accordance with Code Section 506(a), $26,000,000 is treated as a Class 1 secured claim, and $18,546,698.48 (the difference between the Aggregate Claim and the Class 1 secured claim) is treated as a Class 6 unsecured claim. The secured claim of Computershare is impaired, and entitled to vote to accept or reject the Plan, in accordance with one of the following three options, which it shall elect in writing on the ballot provided for Class 1, and returned to the Debtor prior to this Court's entry of an order approving the Disclosure Statement. In the event that Computershare does not make a timely election,

[1] As of the date of this Plan, there was pending a motion by the Debtor [Doc 829] to terminate further adequate protection payments. In the event such payments are continued beyond January 2, 2026, the Aggregate Claim will be reduced further by such amounts, with a corresponding reduction to the Class 6 Claim and payment amounts.

its secured claim shall be treated in accordance with Option 1A and its unsecured claim shall be treated in accordance with Class 6.

- **Option 1A:** Provided that Computershare does not elect to proceed under Options 1B or 1C as discussed herein, Computershare's secured claim shall be $26,000,000, which amount represents the total current value of the Hotel and other assets pledged by the Debtor to secure the WHEDA Loans. Computershare's secured claim shall be paid in full, with interest, over a term of 18 years from the Effective Date, at a rate of 320 basis points over the yield on the Effective Date as reported by the United States Department of the Treasury for five-year Treasury securities, and adjusted on the 5th, 10th and 15th anniversaries of the Effective Date (the "**Adjustment Dates**") to reflect 320 basis points over the yield on each Adjustment Date as reported by the United States Department of the Treasury for five-year Treasury securities as of each such Adjustment Date. . Payments of $1,500,000 per annum, shall be paid in equal monthly instalments of $125,000, with the first payment due on the first day of the first full month that begins after 30 days fromthe Effective Date, with each subsequent monthly payment due on the first day of each subsequent month, and followed by a final balloon payment of $34,322,050.00 on the first day of the 217th month, estimated to be November 2044.

  If Computershare elects to proceed under Option 1A (or by failing to elect any option, is treated under Option 1A and Class 6), Computershare shall retain liens securing its secured claim hereunder until such time as its secured claim has been paid in full pursuant to the terms of the Plan, at which time Computershare shall execute documents reasonably necessary to release all liens or security interests in any and all property securing Computershare's claim.

- **Option 1B:** Provided that Computershare does not proceed under Option 1A as discussed herein, and Computershare makes a timely election pursuant to the provisions of Section 1111(b), Computershare shall have a secured claim in an amount which is calculated to be $61,322,050, and have a present value of $26,000,000, based upon its payment in full over a term of 18 years from the Effective Date, at a rate of 320 basis points over the yield reported by the United States Department of the Treasury for five-year Treasury securities on the Effective Date, and adjusted on the 5th, 10th and 15th anniversaries of the Effective Date (the "**Adjustment Dates**") to reflect 320 basis points over the yield reported by the United States Department of the Treasury for five-year Treasury securities as of each such Adjustment Date. (For illustration purposes only, as of the date of this Plan, the Claim amount herein is estimated to be $61,322,050.00 on the basis of an interest and discount rate of 6.9%, derived from 320 basis points

over the recently-reported 3.7% yield on five-year Treasury securities.) Fixed payments of $1,500,000 per annum, shall be made in equal monthly payments of $125,000, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, with each subsequent monthly payment due on the first day of each subsequent month, and followed by a final balloon payment of $34,322,050 ("**Balloon Payment**") which shall be paid on the first day of the 217th month, estimated to be November 2044. On each Adjustment Date that the interest rate to be applied hereunder changes, the Balloon Payment shall be increased or decreased as may be appropriate to assure that the Effective Date present value remains $26,000,000.

If Computershare elects to proceed under Option 1B, Computershare shall retain liens securing its claim until such time as its secured claim has been paid in full pursuant to the terms of the Plan, at which time Computershare shall execute documents reasonably necessary to release all liens or security interests in any and all property securing Computershare's claim.

- **Option 1C**: Computershare may elect to have JSM (or its designee) (for purposes of this Option 1C, the "**Bond Purchaser**") purchase the Bonds held by WMH Funding, and assigned to Computershare, or the WHEDA Loans (at the Bond Purchaser's election) on the Effective Date, for $26,000,000 in exchange for full and complete reciprocal releases, provided that such election must be expressed in a writing delivered to Debtor's counsel on or before the close of business on Friday, January 30, 2026 (except that this deadline may be extended at the Debtor's sole discretion). If this Option 1C is elected, for purposes of this Plan the Bond Purchaser shall be deemed to hold either the Class 1A and Class 6 claim in lieu of Computershare, or the Class 1B claim in lieu of Computershare, as the Bond Purchaser may in writing elect on or before the conclusion of Plan confirmation hearings.

3.4 **CLASS 2 – Secured Claim of WMH Funding.**

The secured claim of WMH Funding is impaired under the Plan, and treated as $0.00, because the value of the collateral securing the guaranty of a $2,104,633.00 loan made to non-debtor JSM, is less than the amounts needed to satisfy the Aggregate Claim of Computershare, which is senior in priority on the same collateral.

3.5 **CLASS 3 – Secured Claim of J.M. Brennan, Inc.**

The secured claim of J.M. Brennan, Inc. is impaired under the Plan, and treated as $0.00, because the value of the collateral securing its $81,502.10 for unreimbursed Hotel repairs, is less than the value of the collateral securing the Aggregate Claim of Computershare, and the WMH Funding Claim, which are senior in priority on the same collateral.

3.6 **CLASS 4 – Priority Unsecured Claim of US Foods.**

The claimant in Class 4 is unimpaired with respect to its priority unsecured claim of $15,556.94, which shall be paid in full on the Effective Date.

3.7 **Equity Auction Excess Proceeds for Unsecured Creditors**.

With respect to Holders of Allowed Unsecured Claims in Classes 5, 6, 7, 8, and 9 below, except to the extent that any such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Claim, each Holder of an Allowed Unsecured Claim in Classes 5, 6, 7 and 8 shall receive, in addition to the treatment set forth below, its pro rata share of any Equity Auction Excess Proceeds up to such amount as will constitute payment of its Allowed Unsecured Claim in full, taking account of all payments scheduled below that have been made through the date of distribution of the Equity Auction Excess Proceeds. Total distributions of such Excess Sale Proceeds, less any distributions previously made, shall be treated as a prepayment of and in lieu of any scheduled distributions yet to be made, and will otherwise be capped at 100% of the Allowed amount of such Claims. In the event that all Allowed Unsecured Claims in Classes 5, 6, 7 and 8 are paid in full on the basis of the foregoing, and Excess Sale Proceeds remain, the Unsecured Creditors in such Classes will then be paid interest at the same rate applicable to the Class 1A and Class 1B Claims (approximately 6.9% as of today by illustration only) from the Effective Date to the date of such full payment. If Excess Sale Proceeds remain after the prior distributions above, they shall then be distributed on the same basis, including interest if paid in full, up to 100% of the Allowed amount of the Claims of the Holders of Allowed Unsecured Claims in Class 9. For the avoidance of doubt, no distributions of Equity Auction Excess Proceeds shall be made to Holders of Allowed Unsecured Claims in Class 9, unless any such excess proceeds remain after distributions have first been made to Classes 5, 6, 7, and 8 in amounts sufficient to pay the Allowed Claims in such Classes in full, plus interest.

The treatment provided to Unsecured Claims under this Plan has been structured to comply with the Bankruptcy Code, including the requirements of section 1129(a)(7) (the "best interests" test) and, to the extent applicable,

section 1129(b) (the "fair and equitable" test). The Disclosure Statement contains a liquidation analysis demonstrating that the value being provided to Holders of Unsecured Claims under the Plan exceeds what such Holders would receive in a hypothetical chapter 7 liquidation.

3.8 **CLASS 5 – Unsecured Claims of White Lodging.**

The White Lodging claims are impaired. White Lodging has asserted Claims 15 and 16 of approximately $22,500,000. It shall be allowed a claim of $1,040,000 (or such other amount as may be determined by the Court in connection with ongoing litigation of the Debtor's objections to Claims 15 and 16), to be paid a 10% dividend of $104,000 over 18 years in equal monthly payments, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, or within a reasonable time after a settlement or final judicial determination of the amount of its claims in the event litigation of its claim amounts is ongoing. The Debtor will show through a line item on its projections that it will have sufficient resources to pay White Lodging 10% or $2,250,000 over 18 years, which would equate to $125,000 per year, or $10,417 per month, were the Court to conclude through the foregoing adjudication to the full amounts asserted in Claims 15 and 16.

3.9 **CLASS 6 – Unsecured Claim of Computershare.**

Class 6 is Computershare's deficiency claim (its Aggregate Claim less the portion treated as secured under Class 1), in the amount of $18,546,698.48, and is impaired (*see* note 1), unless Class 1 elected to have its claim treated pursuant to Options 1B or 1C (as discussed above), in which case the Class 6 Claim will either be extinguished (if Option 1B is elected) or it may become the Claim of the Bond Purchaser if Option 1C is elected. This unsecured claim shall be paid a 10% dividend in the amount of $1,854,669.85 over 18 years in equal monthly payments of $8,586.43, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, and each monthly payment due on the 1st day of the same month thereafter, until paid in full.

3.10 **CLASS 7 – Unsecured Claim of WMH Funding.**

Class 7 is the unsecured claim of WMH Funding in the amount of $2,113,408.30. WMH shall be paid a 10% dividend in the amount of $211,340.83 over 18 years in equal monthly payments of $978.43, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, and each monthly payment due on the 1st day of the same month thereafter, until paid in full. Any lien rights WMH Funding may have shall be extinguished upon the Effective Date.

3.11 **CLASS 8 – Vendor Unsecured Claims.**

Class 8 consists of Vendor Unsecured Claims, including the claim of JMB, representing primarily trade debt of the Debtor, and totals approximately $649,000. The claimants in Class 8 are impaired. Class 8 claimants shall be paid a 50% dividend in the approximate aggregate amount of $324,500 pro-rata, in quarterly payments of $32,450 over a 2 ½ year period, with the first quarterly payment due on the first day of the calendar quarter that begins after the Effective Date, and each quarterly payment due on the 1st day of each calendar quarter thereafter, until paid in full.

3.12 **CLASS 9 – Unsecured Claims of JSM and Wave Renovations.**

Class 9 consists of Unsecured Claims of JSM and Wave Renovations, representing short term loans to the Debtor, which totals approximately $863,167. The claimants in Class 9 are impaired. Class 9 claimants shall be paid a 50% dividend in the approximate aggregate amount of $431,583 pro rata, in quarterly payments of $43,158 over a 2 ½ year period, *with the first quarterly payment due on the first day of the calendar quarter that begins after the completion of all the distributions provided for in Class 8*, and each quarterly payment due on the 1st day of each calendar quarter thereafter, until paid in full.

3.13 **Equity Auction Excess Proceeds for Equity Interest Holders**.

With respect to Holders of Allowed Equity Interests in Class 10 below, each Holder of an Allowed Equity Interest shall receive its pro rata share of any Equity Auction Excess Proceeds if, and only to the extent that, any such proceeds remain after such proceeds have first been applied to the payment in full, plus interest, of Claims in Classes 5, 6, 7, 8, and 9.

3.14 **CLASS 10 - Equity Interest Holders of the Debtor.**

All Equity Interests in the Debtor will be extinguished on the Effective Date. However, holders of Equity Interests of the Debtor shall receive pro rata any Equity Auction Excess Proceeds that may remain after the treatment of Classes set forth in section 3.13 above, and will retain such rights in the event that there are any Equity Auction Excess Proceeds available to be distributed to them after their Equity Interests are extinguished on the Effective Date. Because no distributions of Equity Auction Excess Proceeds will be made to Class 10 Equity Interest Holders unless all unsecured creditors are paid in full, plus interest, the Debtor submits that the distribution provided herein does not implicate or violate the Absolute Priority Rule under Code section 1129(b)(2)(B)(ii).

### 3.15 **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3.16 **Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

## ARTICLE 4
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Any and all executory contracts or unexpired leases to which the Debtor was a party as of the Petition Date shall be deemed rejected as of the Effective Date, ***except*** with respect to any contracts assumed with Court authority during the pendency of this chapter 11 case, as well as the following parties' contracts:

4.1 **Access One, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract with Access One, Inc., for SIP (telephone) services at the Hotel. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $213.27.*

4.2 **Airgas USA, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of a service contract with Airgas USA, LLC, for the provision of gas for beverage services at the Hotel. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,268.81.*

4.3 **Amadeus Hospitality Americas, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract with Amadeus Hospitality Americas, Inc. for HOTSOS preventative maintenance. No amount is required to cure any outstanding defaults under the service contract.

4.4 **American Airlines, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its month to month contract with American

Airlines, Inc. for the reservation of flight personnel rooms. No amount is required to cure any outstanding defaults under the service contract.

4.5 **ASCAP.** The Confirmation Order shall authorize and approve the Debtor's assumption of its music licensing contract with ASCAP. No amount is required to cure any outstanding defaults under the licensing contract.

4.6 **Averus Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its month-to-month service contract with Averus Inc. for kitchen hood cleaning. No amount is required to cure any outstanding defaults under the service contract.

4.7 **Canon Solutions America, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its contract for copier services with Canon Solutions America, Inc. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $385.71.*

4.8 **CINTAS Corporation.** The Confirmation Order shall authorize and approve the Debtor's assumption of its supply contract with CINTAS Corporation for the provision of kitchen uniforms. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,903.61.*

4.9 **Cvent PassKey**. The Confirmation Order shall authorize and approve the Debtor's assumption of its contract for room key software. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $10,524.*

4.10 **Granite Telecommunications.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for EPIK (telephone) services at the Hotel. No amount is required to cure any outstanding defaults under the service contract.

4.11 **JS Asset Management LLC.** (A) Provided that JSM is the Winning Bidder in the Debtor's Equity Auction Sale, the Confirmation Order shall authorize and approve the Debtor's assumption of the consulting and asset management agreement with JS Asset Management, LLC (an affiliate of the Debtor's manager and principal equityholder JSM). *As of August 31, 2026, approximately $337,934 will be required to be paid as administrative expenses for post-petition services regardless of the outcome of the Equity Auction Sale, and is accounted for as an Effective Date payment in Section 3.1, above.* JS Asset Management has agreed that upon assumption of its contract on the Effective Date, the Reorganized Debtor shall pay the cure amount for unpaid prepetition fees ($867,270.63) on a quarterly basis of $43,364 per quarter, over a five-year period, commencing with the beginning of the first quarter *after all payments required to be made to Class 8 creditors have been completed.*. (B) In

the event that JSM is not the Winning Bidder in the Debtor's Equity Auction Sale, JS Asset Management's administrative expense claim for post-petition services shall still be paid on the Effective Date, but its consulting and asset management agreement shall be rejected, its prepetition claim amount of $867,270.63 shall be treated as a Class 9 Unsecured Claim, and it shall be treated in the same manner as other Class 9 Claims (including the right to Equity Auction Excess Proceeds, if any).

4.12 **Knowland Group, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for reader board services utilized at the Hotel with Knowland Group, LLC. No amount is required to cure any outstanding defaults under the service contract.

4.13 **Marriott International Inc.** Whether or not JSM is the Winning Bidder in the Debtor's Equity Auction Sale, the Confirmation Order shall authorize and approve the Debtor's assumption of that certain Franchise Agreement Between Marriott International, Inc and Wisconsin & Milwaukee Hotel LLC, dated as of June 17, 2011 (the "**Marriott Franchise Agreement**") solely pursuant to the terms of that certain *Stipulation and Agreed Order Between the Debtor and Marriott International, Inc. Authorizing Assumption of Executory Contract Pursuant to the Provisions of 11 U.S.C. 365(a)* [Doc 849], filed on January 12, 2026 (the "**Marriott Assumption Stipulation**"), including, without limitation, in the event JSM is not the Winning Bidder in the Debtor's Equity Auction Sale, requiring a third-party purchaser to strictly adhere to Marriott's procedures for a re-licensing franchise agreement. To the extent the terms of the Amended Plan or the Confirmation Order conflict or are inconsistent with the terms of the Marriott Assumption Stipulation, the terms of the Marriott Assumption Stipulation shall control and govern to the extent of such conflict or inconsistency.

*At this time, the Debtor believes that the cure amount to be paid in connection with assumption of the Marriott Franchise Agreement is not less than $225,000, which amount does not include the full amount of (i) any outstanding post-petition franchise fees, and (ii) attorneys' fees incurred by Marriott in connection with the Debtor's chapter 11 filing and the formulation, negotiation and finalization of a written amendment to the Marriott Franchise Agreement or a re-licensing franchise agreement, as applicable. Accordingly, this cure amount is subject to increase and adjustment.*

4.14 **OpenTable, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for F&B reservations and marketing with OpenTable, Inc. No amount is required to cure any outstanding defaults under the service contract.

4.15 **Prescriptive Music, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for music programming in the Hotel's public areas. No amount is required to cure any outstanding defaults under the service contract.

4.16 **Relay Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for distress devices for Hotel associates. No amount is required to cure any outstanding defaults under the service contract.

4.17 **Restaurant Technologies, Inc.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract with Restaurant Technologies, Inc. for fryer oil filtration services. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,399.69.*

4.18 **SESAC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the music licensing contract for the Hotel. No amount is required to cure any outstanding defaults under the licensing contract.

4.19 **Tambourine.** The Confirmation Order shall authorize and approve the Debtor's assumption of the marketing service contract with Tambourine. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,699.07.*

4.20 **Towne Park, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of its service contract for valet parking services with Towne Park, LLC. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $58,615.00.*

4.21 **Trane U.S.** The Confirmation Order shall authorize and approve the Debtor's assumption of its maintenance contract with Trane U.S. for the maintenance of the Hotel's HVAC/air conditioning system. No amount is required to cure any outstanding defaults under the marketing services contract.

4.22 **Trip Advisor LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the its marketing services contract with Trip Advisor LLC. No amount is required to cure any outstanding defaults under the marketing services contract.

4.23 **Urban Elevator Service, LLC.** The Confirmation Order shall authorize and approve the Debtor's assumption of the service contract for elevator maintenance between the Debtor and Urban Elevator Service, LLC. *The Debtor believes that the cure amount to be paid in connection with assumption is approximately $1,760.00.*

Unless otherwise provided in this Plan (including section 4.11 hereof) or by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. Unless otherwise provided in this Plan (*e.g.*, section 4.11 and Class 9 hereof), all Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified for distribution purposes with Unsecured Vendor Claims and shall be treated in accordance with Class 8 in Article 3 hereof.

## ARTICLE 5
## IMPLEMENTATION OF THE PLAN

**General Settlement of Claims and Interests.** Except as otherwise provided herein, pursuant to Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.

5.1 To effectuate the proposed Plan, WMH shall continue its Hotel operations. WMH will utilize income from its operations, and cash on hand on the Effective Date (including $8 million in the proceeds of the Equity Auction) to fund the proposed Plan, and will also use funds from the Equity Auction in order to pay for necessary renovations and improvements, as well as to comply with Plan obligations.

5.2 Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) transfer to the Reorganized Debtor of $8 million from the proceeds of the Equity Offering; (2) issuance and distribution of the New Common Units; and (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Reorganized Debtor or any Unit Holders or members thereof.

5.3 The Debtor shall retain all property of the estate, with no transfer of estate property being anticipated at this time except as may be particularly set forth herein. The Debtor reserves its right to sell or transfer any of its property, with the proceeds to be distributed to lien holders according to their priorities.

5.4 Interest on all Allowed Secured Claims as provided in the Plan shall commence upon the Effective Date of the Plan, or as otherwise expressly set forth herein.

5.5 The Debtor may prepay any amount to any Class at any time without penalty.

5.6 No distributions of under $5.00 shall be made by the Debtor, and no payments shall be made on claims under that amount. Any distribution checks which have not been negotiated and cleared six months after their distribution may be cancelled by the Debtor without further liability for that distribution.

5.7 Unless otherwise agreed by the Debtor, all distributions shall be mailed to creditors at the addresses shown on the Debtor's schedules, except those creditors who have filed a Proof of Claim or notice of appearance in this action shall have their distribution checks sent to the address shown on the Proof of Claim if available, and if not, to the address for the notice of appearance. Any creditor may change the address for mailing of the distribution check by written notice to counsel for the Debtor. Any distribution checks properly sent to such addresses which are returned shall become the property of the Debtor without further liability for such distributions.

5.8 Confirmation of this Plan shall not preclude or estop the Debtor from pursuing any claims of the estate, including any Avoidance Actions, if any, nor any other clams against any of the Debtor's creditors for offset, except as may be expressly set forth herein.


Case 24-21743-gmh Doc 1103 Entered 12/28/26 16:34:28 Page 23 of 39

5.9 **The Reorganized Debtor**. The Debtor shall emerge from Bankruptcy as the Reorganized Debtor with all of the rights, powers, duties and obligations set forth below.

a) **Vesting of all Property**. Except as expressly provided in this Plan, on the Effective Date, all assets of the Debtor's Bankruptcy Estate shall vest in the Reorganized Debtor.

b) **Governance, Powers and Duties.** On and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and the Court. The Reorganized Debtor shall also have the powers, duties and obligations set forth in this Plan. On and after the Effective Date, all actions required of the Debtor shall be taken by the Reorganized Debtor, or its designee, in the name of and on behalf of the Debtor and its bankruptcy estate. The Reorganized Debtor shall be authorized to execute documents on behalf of the Debtor and its bankruptcy estate. The duties, responsibilities and obligations of the Reorganized Debtor include, but are not limited to, all matters for which the Court is retaining jurisdiction, including the following:

- making distributions under the Plan;
- preparation and filing of tax returns, on behalf of the Debtor, its bankruptcy estate, including the right to request a determination of tax liability as set forth in Section 505 of the Bankruptcy Code;
- requesting and receiving of W-9 federal tax forms for any party who is entitled to receive a distribution on account of a Claim or Interest;
- prosecution and resolution of causes of action, if any, including any Avoidance Actions;
- Claims objections and reconciliation;
- Payment of any post-confirmation fees due to the Office of the United States Trustee; and
- The compromise and settlement of Claims, causes of action, and other proceedings and matters.

c) **Attorney Client Privilege to Extend to Reorganized Debtor.** The Reorganized Debtor shall stand in the same position as the Debtor with respect to any rights the Debtor may have to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Reorganized Debtor shall succeed to all of the Debtor's rights to preserve, assert or waive any such privilege.

d) **Retention of Professionals.** The Reorganized Debtor may retain such attorneys (including special counsel), accountants, advisors, expert witnesses, and other professionals as they shall consider advisable without

necessity of approval of the Court. Persons who served as professionals to the Debtor prior to the Effective Date may serve as professionals to the Reorganized Debtor. The fees and expenses of the Reorganized Debtor and professionals retained by them shall be paid by the Reorganized Debtor in the ordinary course of business and without Court review or approval.

e) **Causes of Action Retained and Preserved.** All causes of action that are not otherwise compromised, settled, released or waived pursuant to the terms of this Plan shall be retained by the Reorganized Debtor and preserved. Except as otherwise expressly provided in the Plan, the Reorganized Debtor retains all rights, claims, defenses, setoffs, recoupment and causes of action the Debtor or its estate may have against any third parties, and may pursue and/or enforce such retained rights, claims, defenses or causes of action in accordance with applicable non-bankruptcy law.

f) **Capital Gains Taxes.** Any taxes payable on capital gains realized by the Debtor as a result of the disposition of certain assets under the Plan, or by any person or entity contributing assets to the Debtor under the Plan, shall be paid when and as they become due.

g) **Bar Date and Resolution of Claims.** All holders of contested claims, including unpaid Administrative Claims and professional fees, must file with the Court their final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Effective Date and in accordance with the substantive and procedural requirements in the Bankruptcy Code. The Reorganized Debtor shall be responsible for the resolution of Claims, and shall have standing to object to the allowance of any Claim and to assert and prosecute any counterclaim relative thereto (without prejudice to any right of any other party in interest to do so under applicable law). All such objections and counterclaims shall be filed no later than one hundred eighty (180) daysafter the Effective Date, or within such further time as may be fixed by the Court.

h) **Unresolved Claims.** If on a date on which payments are made on account of the Allowed Claims of a given class, there exist any Unresolved Claims in such class, the amount of cash distributed to holders of Allowed Claims in that class shall be determined as if all Unresolved Claims were Allowed Claims in the full amount claimed by the holders thereof (or in such lesser amount as the Court determines by Final Order) and the Reorganized Debtor may, in such circumstances, hold in a separate reserve account the cash that would have been distributed to the holders of the Unresolved Claims for such class if the full amount of their Claims, or such lesser

amount as the Court determines, were Allowed Claims on such distribution date, or the Debtor may request the Court to waive such segregation of funds on the basis of evidence that the Debtor will have sufficient resources from operations and other sources to make required distributions to such persons holding Unresolved Claims. Interest earned on cash in the reserve account shall likewise be added to the balance of the reserve account, and will revert to the Reorganized Debtor after Unresolved Claims are determined, and distributions made on account therefor. To the extent that an Unresolved Claim becomes an Allowed Claim after payments are made on account of Allowed Claims in such class, the Reorganized Debtor shall, as soon as practicable thereafter, distribute to the holder of the newly Allowed Claim the amount of cash that such holder would have received to date had its Claim been an Allowed Claim as of the Effective Date. To the extent that all or a portion of any Unresolved Claims are disallowed, any excess funds held in the reserve account shall revert to the Reorganized Debtor.

5.10 **Equity Auction.**

a) In order to raise $8 million needed for exit financing, including for renovations, and to provide a cushion to protect against unknown future events which could negatively impact income from operations, the Debtor will move the Court under Code section 363 ("**363 Motion**") to conduct an auction sale of equity to be newly issued on the Effective Date ("**New Equity**"). At least $8 million ("**JSM Bid**") will be provided by JSM or its designee (together, "**JSM**"), through a committed subscription agreement as a lead or Stalking Horse Bidder. The Debtor may also later file a separate motion (the "**Marketing Motion**") to engage a professional firm to enhance the marketing of the New Equity acquisition opportunity.

b) The Debtor will file the 363 Motion for approval of Auction and Equity Sale Bidding Procedures on January 12, 2026, including for approval of the JSM Bid as Stalking Horse Bid, and bidding procedures (the "**Auction and Bidding Procedures**") which shall, among other things, govern the qualification requirements for potential competing bidders, and the submission of competing bids for the purchase of the New Equity. (If the Debtor determines to file the Marketing Motion, it shall be filed with sufficient time to be determined by the Court on or before the commencement of Plan confirmation hearings.) The principal terms of the JSM Bid and the Auction and Bidding Procedures for which approval will be sought in the 363 Motion are as follows:

1. **<u>Stalking Horse Bidder to Assure Capital Infusion of at least $8 million on the Effective Date</u>**. On or before the 363 Motion is filed,

JSM will have entered into a subscription agreement ("**New Equity Subscription Agreement**") to purchase the New Equity for $8 million on the Effective Date. These funds (and such higher amounts as may be bid if there is competitive bidding) shall be provided in the form of a loan to JSM from RFIC, an entity that is affiliated with an equity investor in JSM. On or before the 363 Motion is filed, RFIC will also have entered into a commitment to provide such loan to JSM, provided, however, that RFIC shall not obtain any ownership interest or equity in either JSM or the Debtor as a result of providing such loan.

2. **Qualified Bidder Requirements**. Anyone may submit a competing bid and participate in the auction, provided they first become a qualified bidder ("**Qualified Bidder**"). JSM is deemed to be a Qualified Bidder, subject to its provision of the Cash Deposit (defined below). The opportunity to bid by becoming a Qualified Bidder will be publicized with notices (the "**Public Notice Date**") in the national editions of the *New York Times* and the *Wall Street Journal*, as well as on internet sites that promote and publicize bankruptcy auctions. The requirements to become a Qualified Bidder ("**Qualified Bidder Requirements**") shall include (a) execution of a non-disclosure agreement to protect the confidentiality of information provided by the Debtor (and Marriott) for the purposes of bidder diligence, (b) a legally binding commitment to assume and ensure that the Reorganized Debtor complies with all the obligations set forth in the confirmed Plan, (c) a demonstration that the person seeking to bid is an "Accredited Investor" as defined in Regulation D of the Securities Act of 1933, (d) a demonstration to the satisfaction of the Debtor of the person's financial wherewithal to (X) close on a purchase of the New Equity for a minimum of $8,250,000 (the Stalking Horse Bid plus the first minimum competing bid increment) plus additional available liquidity of an additional 50% (or ability to pay a total of up to $12,375,000) to assure that the person seeking to bid at the auction can perform on such higher bids as it may elect to make up to $12,375,000, (Y) subject to Marriott's approval, which must be obtained prior to any scheduled Auction, provide an unlimited guaranty of the Debtor's obligations to Marriott, and (Z) pay for the difference between $8,000,000 and at least $10,250,000 of renovations expected to be required of a new owner as set forth in the June 4, 2025 Appraisal of the Milwaukee Marriott Downtown by LW Hospitality Advisors; (e) submission of a fully authorized (with evidence of due authorization) and executed New Equity Subscription Agreement, without condition or contingency other than approval of the sale by the Bankruptcy Court, in the amount of at least the $8,250,000 million required for a competing bid, (f) a cash deposit in the amount of twenty percent (20%) of the bid's proposed purchase price to a non-interest bearing escrow account of

Debtor’s counsel (the “**Cash Deposit**”); and (g) a commitment to strictly adhere to all requirements of the applicable provisions of suchfranchise agreement as Marriott in its sole discretion may be willing to approve for a new owner of the Debtor’s equity, including any Transfer of Controlling Ownership Interests (as such term is defined in the Marriott Franchise Agreement), change of Control (as such term is defined in the Marriott Franchise Agreement), or other Transfer (as such term is defined in the Marriott Franchise Agreement) provisions, as applicable. Among other things, this means that with respect to any person seeking to be a Qualified Bidder, such person must commit to the payment of required fees and costs as set forth in the Marriott Franchise Agreement, and to enter into all required agreements with Marriott, including, without limitation, any guaranty and property improvement plan to address any necessary renovations to the Hotel, if required by Marriott.

3. **<u>Cash Deposits Not Property of the Estate</u>**. All funds delivered in connection with the Equity Auction shall be deposited and held in a segregated account designated as Equity Auction Proceeds Account, pending the Effective Date, or as otherwise provided herein. Such funds shall not constitute property of the Debtor's estate. Prior to the Effective Date, any Equity Auction Excess Proceeds shall be transferred from the Equity Auction Proceeds Account to a segregated Excess Proceeds Account, and thereafter shall constitute property of the Debtor’s estate. On the Effective Date, the Equity Auction Proceeds Account ($8 million) shall be released to the Reorganized Debtor and shall be used to fund necessary capital improvements, and otherwise generally for prospective Plan obligations and operations.

4. **<u>Qualified Bidder Deadline</u>**. There will be a 45-day period proposed from the Public Notice Date pursuant to paragraph 2 above to the deadline for a purchaser to become a Qualified Bidder (“**Qualified Bidder Deadline**”), in order to permit diligence by any such party interested in participating in the auction. Interested parties who wish to become Qualified Bidders shall have until the Qualified Bidder Deadline to review information related to the Debtor, provided that they have first satisfied at least the Qualified Bidder Requirements set forth in paragraphs 2(a)-(d) above. On or prior to the date that public notice is provided, the Debtor shall establish a virtual data room which shall be populated with historical financial information, and other available information as would customarily be reviewed by a potential purchaser. Any potential purchaser must enter into a non-disclosure agreement prior to being granted access to such virtual data room.

5. **Cancellation of Auction**. If at the Qualified Bidder Deadline, there are no Qualified Bidders other than JSM, then the Debtor shall cancel the auction, and JSM shall close on its acquisition of the New Equityon the Effective Date; provided that JSM shall strictly adhere to all applicable provisions of the Marriott Franchise Agreement (as amended and agreed by Marriott) prior to closing on its acquisition of the New Equity, and, to the extent the terms of the Marriott Franchise Agreement and the 363 Motion and/or Bidding Procedures conflict, the terms of the Marriott Franchise Agreement shall control and govern.

6. **Conduct of Auction**. If there are Qualified Bidders other than JSM, then 14 days after the Qualified Bidder Deadline (the "**Auction Date**"), the Debtor shall conduct a live auction (in person and via Zoom) of the New Equity at the offices of its counsel, Richman & Richman LLC, at 122 West Washington Avenue, Suite 850, Madison, WI 53703. The first bid of a Qualified Bidder other than JSM must be at least $8,250,000 . Thereafter, bids must exceed prior bids by at least $250,000.

7. **Highest and Best Bid**. Bids shall be in cash only, and the New Equity will be sold only in its entirety. The highest and best bid shall be the bid of a Qualified Bidder that is the highest at the end of the Auction. At the conclusion of the Auction, the Debtor, subject to the Bankruptcy Court's approval, shall determine (i) which bid constitutes the highest or best offer (the "**Winning Bid**"); and (ii) the next highest or best bid (the "**Back-Up Bid**"). The Winning Bidder or the Back-Up Bidder, as applicable (each to the extent approved by the Bankruptcy Court) and the Debtor must each strictly follow all applicable procedures and requirements in the Marriott Franchise Agreement, including any Transfer of Controlling Ownership Interests (as such term is defined in the Marriott Franchise Agreement), change of Control (as such term is defined in the Marriott Franchise Agreement), or other Transfer (as such term is defined in the Marriott Franchise Agreement) provisions, as applicable, following approval by the Bankruptcy Court of any New Equity sale and prior to closing on any acquisition of the New Equity.

8. **Required Approvals by Marriott**. Following the Auction, and the Court's approval of the sale as provided in paragraph 13, below, any person other than JSM who has any Winning Bid or Backup Bid shall have sixty (60) days, or such additional time, not to exceed another sixty (60) days, as Marriott may reasonably require in its sole discretion to complete its approval process, to obtain Marriott's approval in connection with the applicable procedures and requirements in the Marriott Franchise Agreement set forth in paragraph 8, above. In the event that a Winning Bidder or Backup Bidder fails to obtain Marriott's

approval as provided herein, their Cash Deposit shall be forfeited to the estate, and the prevailing bid shall be adjusted to the highest amount that was submitted by such prevailing bidder before the first bid made by the person who failed to obtain Marriott's approval.

9. **Additional Auction Rules**. The Debtor may announce additional procedural rules for the submission of bids that are reasonable under the circumstances, so long as such rules are not inconsistent with these Bidding Procedures and subject to the review of the Bankruptcy Court.

10. **Excess Sale Proceeds to be Distributed to Unsecured Creditors and Existing Interest Holders**. To the extent the Winning Bid exceeds $8,000,000 (net of marketing expenses, including the fees and expenses of any professional firm engaged pursuant to the Marketing Motion), all such excess cash shall be held by the Debtor in the Excess Proceeds Account pending final disposition of the White Lodging Claims and any other Claims objections, and will thereafter be distributed to the Holders of Allowed Unsecured Claims in Classes 5, 6, 7, and 8 on a pro rata basis, in addition to the distributions previously made and provided in this Plan. If total distributions of such Excess Sale Proceeds would exceed 100% of the Allowed amount of such Claims, they shall be treated as a prepayment of and in lieu of any scheduled distributions yet to be made, and capped at 100% of the Allowed amount of such Claims. In the event that all Allowed Unsecured Claims are paid in full on the basis of the foregoing, and Excess Sale Proceeds remain, the Unsecured Creditors in Classes 5, 6, 7, and 8 will then be paid interest at the rate of 320 basis points above the yield on five-year Treasury securities as reported by the United States Department of the Treasury as of the Effective Date (if today, approximately 6.9%) from the Effective Date to the date of full payment. If Excess Sale Proceeds remain after the prior distributions above, they shall be distributed on the same basis, including interest if paid in full, to the Holders of Allowed Unsecured Claims in Class 9. If Excess Sale Proceeds remain after that, they shall in their entirety and without limitation be distributed to Existing Equity Holders in Class 10. Where the Winning Bid is made by a party other than JSM, JSM shall have standing to continue to prosecute any objections then pending or as may be made to unsecured claims, in order to protect its residual interest in Excess Sale Proceeds, because in such circumstances it will be the principal economic beneficiary of any Claims objections that are sustained.

11. **Consent to Jurisdiction**. All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the United States Bankruptcy Court for the Eastern District of Wisconsin and waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of the New Equity Purchase Agreements.

12. **Sale Approval Hearing**. The Court shall conduct a hearing to approve the New Equity sale, and including in the event JSM is not the winning bidder, the assumption by the Winning Bidder and agreement to all the obligations under the Plan, pursuant to the Auction results, as soon after the Auction Date as the Court can accommodate on its calendar.

13. **Disposition of Cash Deposits**. Promptly after the Bankruptcy Court's entry of an order approving the sale of the New Equity, the Cash Deposits submitted by all Qualified Bidders (other than the Winning Bidder and the Back-Up Bidder) shall be returned to the respective Qualified Bidders. The Cash Deposit of the Winning Bidder shall be applied to the sale price set forth in the Winning Bidder's New Equity Subscription Agreement. If the Winning Bidder fails to consummate the purchase of the New Equity, including that it failed to obtain the approval of Marriott as provided above, the Cash Deposit of such Winning Bidder shall be forfeited to the Debtor. Notwithstanding this forfeiture, the Debtor specifically reserves the right to seek all additional available damages from any defaulting Winning Bidder. In the event the Winning Bidder does not close on the sale of the New Equity, the Debtor shall sell the New Equity to the Back-Up Bidder pursuant to its New Equity Subscription Agreement, provided that the Back-Up Bidder has obtained Marriott's approval as provided above. The Debtor will retain the Back-Up Bidder's Cash Deposit until the sale to the Winning Bidder closes, and the Back-up Bidder shall remain obligated to close a sale transaction with the Debtor based on the Back-Up Bidder's New Equity Subscription Agreement until the Sale to the Winning Bidder closes. Within seven (7) calendar days of the closing of the sale to the Winning Bidder, the Debtor shall return the Deposit to the Back-Up Bidder.

5.11 **Securities Laws Matters.**

The New Common Units shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code or, to the extent section 1145 is unavailable, pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. The Common Units issued pursuant to section 1145 of the Bankruptcy Code may be resold without registration under the

Securities Act or other federal securities laws pursuant to the exemption provided by section 1145(c) of the Bankruptcy Code, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

For any Common Units issued to Holders who may be deemed "underwriters" under section 1145(b) of the Bankruptcy Code, the Reorganized Debtor will rely on the exemption from registration provided by section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Such Equity Offering Shares will be "restricted securities" subject to resale restrictions under applicable securities laws and will bear a legend to that effect. Holders of such restricted securities may resell their securities pursuant to Rule 144 under the Securities Act or another available exemption from registration, subject to the restrictions on transfer set forth in the Amended Operating Agreement.

5.12 **New Organizational Documents.**

On the Effective Date, the New Organizational Documents shall become effective and shall replace the existing organizational documents of the Debtor. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance by the Reorganized Debtor of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate its New Organizational Documents, as permitted by Wisconsin law. If there is no change in Debtor's ownership through the Equity Auction, the Reorganized Debtor shall continue to be managed by JSM without compensation, except that fees may continue to be earned pursuant to the asset management agreement of JS Asset Management which will be assumed as provided above.

The New Organizational Documents shall, among other things:

(a) Authorize the issuance of the New Common Units;
(b) Set forth the rights and privileges of each holder of Common Units, including voting rights and distribution rights;
(c) Include provisions requiring the approval of holders of specified percentages of Common Units for certain corporate actions, including:
    i. Amendments to the New Organizational Documents;
    ii. Issuance of additional equity securities;
    iii. Mergers, consolidations, or sales of all or substantially all assets;
    iv. Dissolution or liquidation; and
    v. Related party transactions above specified thresholds.
(d) Establish preemptive rights allowing holders of New Common Units to maintain their percentage ownership in the Reorganized Debtor in connection with future equity issuances; and

(e) Include transfer restrictions designed to ensure compliance with applicable securities laws.

## ARTICLE 6
## CONFIRMATION REQUIREMENTS AND PROCEDURES

6.1 **Acceptance of the Plan.** The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is accepted by all impaired classes of Claims and Interests entitled to vote for or against the Plan or, if rejected by an impaired class, that the Plan is accepted by at least one impaired class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, OTHER THAN THE ACCEPTANCE OF ALL IMPAIRED CLASSES, THE PLAN PROPONENTS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) "CRAMDOWN" REQUIREMENTS HAVE BEEN SATISFIED.**

## ARTICLE 7
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

7.1 **Conditions to Confirmation**. The Plan shall not be confirmed unless and until each of the following conditions have occurred or have been waived in writing by the Debtor:

A. The Disclosure Statement Order has been entered by the Bankruptcy Court; and

B. The Bankruptcy Court enters the Confirmation Order in form and substance acceptable to the Debtor.

7.2 **Withdrawal of the Plan.**

A. Withdrawal Right. Notwithstanding anything contained in this Plan to the contrary, the Debtor reserves the absolute right, in its sole discretion, to withdraw this Plan at any time prior to the entry of the Confirmation Order by the Bankruptcy Court. Such withdrawal may be effectuated by filing a notice of withdrawal with the Bankruptcy Court and serving such notice on all parties entitled to notice under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the Bankruptcy Court.


Case 24-21743-gmh Doc 1113 Entered 10/23/26 16:34:28 Page 33 of 39

B. Effect of Withdrawal. In the event of such withdrawal, this Plan shall be deemed null and void in its entirety and of no force or effect, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or Entity, or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor.

C. No Prejudice. The withdrawal of this Plan shall not prejudice the Debtor's right to request Court approval to file a subsequent plan of reorganization or liquidation, nor shall such withdrawal constitute a waiver of any rights, claims, or defenses of the Debtor.

7.3 **Conditions to Effective Date**. The Effective Date shall occur only if the Conditions to Confirmation have been satisfied, and the Debtor has cash from all available sources sufficient to make all payments required to be made on the Effective Date, unless the recipients of any payment required under the Plan agree in writing to receive a deferred payment, and the following further conditions are met (unless waived in writing by the Debtor):

a. **Equity Auction.** The Equity Auction must be successfully concluded, such that the sale of new Common Units may be consummated at the Effective Date closing.

b. **Option 1C Funding**. In the event that Class 1 elects treatment under Option 1C, the Bond Purchaser must effectuate and close on the acquisition of the Bonds or the WHEDA Loans (as it may elect).

c. **New Management Agreement**. The Debtor must have a new or amended management agreement in effect with a management company on or before the Effective Date. This is expected to be with either White Lodging or Avion Hospitality.

d. **Franchise Agreement**. The Debtor must have Court approval to assume the Marriott Franchise Agreement with Marriott International as the parties have agreed to amend it. A motion for such approval is currently pending [Doc 644]. In the event that JSM is not the Winning Bidder at the Equity Auction, the Debtor and Marriott must agree to the terms of a "new owner" franchise agreement, and the Court must approve the Debtor's entry into such franchise agreement.

7.4 **Waiver of Conditions**. The Conditions to Confirmation and the Effective Date set forth in this Article 7 may be waived by the Debtor without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## ARTICLE 8
## EFFECT OF CONFIRMATION OF PLAN

8.1 **Release and Discharge of Debtor.** Except as may be otherwise expressly provided in this Plan, the confirmation of this Plan (subject to the occurrence of the Effective Date) will discharge the Debtor from any Claim that arose before the Confirmation Date and any Claim of the kind specified in 11 U.S.C. §§ 502(g), 502(h), or 502(i), whether or not a Proof of Claim is filed or deemed filed, whether or not such Claim is Allowed, and whether or not the Holder of such Claim has voted on this Plan.

a. **Exculpation**. The Debtor, its agents, managers, financial advisors, attorneys, accountants, and other professionals, to the maximum extent permitted by applicable law, are released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of this Chapter 11 Case, including, but not limited to, the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; and other actions taken in furtherance of the Plan from the Petition Date up to the Effective Date. The exculpation does not cover claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct, or to any post-Effective Date obligations of the Reorganized Debtor.

b. **Injunction.** Commencing on the Effective Date, except as expressly provided otherwise in this Plan, the holders of all Claims shall be enjoined from asserting against the Debtor and Reorganized Debtor, or its assets and property, any other or further liabilities, liens, obligations or claims, including, but not limited to, all principal and accrued and unpaid interest on the debts of the Debtor, based on any act or omission, transaction, or other activity or security interest, or other agreement of any kind or nature of agreement occurring, arising or existing prior to the Confirmation Date that was or could have been the subject of any claim, whether or not allowed. All legal or other proceedings or actions seeking to establish or enforce liabilities, liens, claims, or obligations of any nature against the Debtor or assets or properties received or retained by the Reorganized Debtor with respect to debts and obligations, if any, of the estate, arising before the Confirmation Date, shall be permanently stayed and enjoined, except as may otherwise be specifically provided for in this Plan.

8.2 **Binding Effect.** The provisions of the Plan, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plans, any person acquiring the equity of the Reorganized Debtor, and any Creditor of the Debtor, whether or not the Claim of such Creditor is Impaired under the Plan and whether or not such Creditor has accepted the Plan.

8.3 **Closing the Bankruptcy Case.** Upon substantial consummation of the Plan, the Debtor may apply for an order closing the case.

8.4 **Reopening of the Bankruptcy Case.** The case may be reopened to administer assets, to grant the Reorganized Debtor other relief, including but not limited to, a discharge, to seek conversion or dismissal upon occurrence of a subsequent material default under the Plan, to hear and resolve any matter or proceeding over which the Court has retained jurisdiction, or for other cause.

## ARTICLE 9
## MODIFICATION OF THE PLAN

The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, in its sole discretion, to move the Bankruptcy Court for authority to amend or modify the Plan at any time prior to the entry of the Confirmation Order. *Upon and after entry of the Confirmation Order*, the Debtor may also, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder and the votes of each Class for or against the Plan shall be counted and used in connection with the modified plan of reorganization. The Debtor reserves the right to amend any exhibits or schedules to the Plan, whereupon each such amended exhibit or schedule shall be deemed substituted for the original of such exhibit.

After the Confirmation Date, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among the Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the Claim or Equity Interest of such Holder hereunder.

## ARTICLE 10
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The Debtor has not sought or obtained rulings from the Internal Revenue Service or any state or local taxing authority with respect to the tax consequences, if any, of the Plan and the transactions contemplated under either of the foregoing. **CREDITORS AND EQUITY HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS OF THE CONSUMMATION OF THE PLAN.**

## ARTICLE 11
## RETENTION OF JURISDICTION BY THE COURT

After the Confirmation Date, the Court may retain jurisdiction, and if the case is closed reopen it, for the following purposes, or as otherwise permitted by law:

11.1 **Objections to Claims.** To hear and determine any objections to the allowance of Claims, and requests for the estimation or liquidation of Claims.

11.2 **Fee Applications.** To hear and determine any and all applications for compensation of professional services and disbursements.

11.3 **Avoidance Actions.** To hear and determine any Avoidance Action or other proceedings to set aside (or preserve for the benefit of the Estate) or recover any property under applicable provisions of the Bankruptcy Code or other federal or state law.

11.4 **Recover Estate Assets.** To recover all assets of the Estate, wherever and however located.

11.5 **Pending Matters.** To hear and determine any pending applications, motions, adversary proceedings, and other contested matters not resolved by the Plan.

11.6 **Modification of the Plan.** To modify the Plan to the extent permitted by the Plan, the Court, and the applicable provisions of Section 1127 of the Bankruptcy Code.

11.7 **Enforcement of Payments, Rights and Interests.** To enforce the terms and provisions of payments, rights and interests required or created by the Plan.

11.8 **Executory Contracts and Unexpired Leases.** To hear and determine all Claims or controversies arising from the assumption or the rejection of any executory contracts or unexpired leases and to consummate their assumption or rejection.

## ARTICLE 12
## GENERAL PROVISIONS

12.1 **Definitions and Rules of Construction.** The definitions and rules of construction stated in sections 101 and 102 of the Bankruptcy Code apply when terms defined or construed in the Bankruptcy Code are used in the Plan.

12.2 **Captions and Headings.** The article and section headings used in the Plan are for convenience and reference only, and they do not constitute a part of the Plan or in any manner affect the terms, provisions, or interpretations of the Plan.

12.3 **Severability.** Should any term or provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of the Plan; provided, however, that this provision shall not be applied or interpreted so as to defeat the primary purpose of the Pan, which is to restructure the Debtor's obligations to its Creditors according to the treatment afforded to their Claims under the Plan.

12.4 **Governing Law.** Except to the extent that the Bankruptcy Code or other provisions of federal law are applicable, the rights and obligations arising under the Plan in any documents, agreements, and instruments executed in connection with the Plan (except to the extent such documents, agreements and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin.

12.5 **Successors and Assigns.** The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

12.6 **Approval of Payments for Certain Services.** All payments made or to be made by the Debtor for services or for costs and expenses in connection with this case, or in connection with the Plan and incident to this case, have been approved by, or are subject to, the approval of the Court, as reasonable.

12.7 **Payment of Quarterly Fees.** All quarterly fees payable under 29 U.S.C. § 1930 shall be paid on or before the Effective Date, as required by 11 U.S.C. § 1129(a)(12). The Reorganized Debtor shall continue to file quarterly fee statements and pay quarterly fees when due until this case is converted, dismissed or closed. The Bankruptcy Court shall retain the jurisdiction necessary to enforce the provisions of this paragraph.

12.8 **No Liquidation or Further Reorganization.** Confirmation of this Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under this Plan.

12.9 **Retirement Benefits.** The Debtor has no retirement benefits which are required to be continued under 11 U.S.C. § 1129(a)(13).

## ARTICLE 13
## CONCLUSION

The proposed Plan set forth herein reflects the Debtor's best efforts to reorganize in an orderly fashion. The Plan attempts to provide payment to secured creditors equal to the value of their respective collateral, and attempts to provide a substantially greater dividend to unsecured creditors than they are likely to receive if the Debtor liquidated its assets.

This Plan deals fairly and equitably with all of the Debtor's Creditors, and approval of this Plan is in the best interests of the Debtor, its estate, and its Creditors.

Dated this 12th day of January, 2026.

**RICHMAN & RICHMAN LLC**
**Attorneys for Debtor**

By: *\/s/ Michael P. Richman*

Michael P. Richman
Claire Ann Richman
Eliza M. Reyes
122 West Washington Avenue, Suite 850
Madison, WI 53703
Tel: (608) 630-8990/Fax: (608) 630-8991
mrichman@RandR.law
crichman@RandR.law
ereyes@RandR.law